599 A.2d 289

**CITY OF LANCASTER, Township of Fulton, Township of West Lampeter, Borough of Marietta, Borough of Strasburg and Arthur E. Morris, George K. Brinton, et al., Appellants,**

**v.**

**COUNTY OF LANCASTER, Board of Commissioners of the County of Lancaster, James E. Huber, Brad S. Fischer, Robert H. Brenneman and Lancaster County Board of Assessment Appeals, Appellees.**

Commonwealth Court of Pennsylvania.

Argued April 3, 1991.

Decided Nov. 15, 1991.

478

Joseph F. Roda, for appellants.

Paul K. Allison, for appellees.

Before CRAIG, President Judge, and COLINS, McGINLEY, SMITH and KELLEY, JJ.

COLINS, Judge.

Appellants [1] are a group of Lancaster County municipalities and individual taxpayers who are appealing a September 12, 1990 opinion and order of the Court of Common Pleas of Lancaster County (Common Pleas), which denied Appellants' Motion for Post–Trial Relief. We reverse.

On October 9, 1987, Appellants filed a Petition for Declaratory Judgment and Complaint, seeking declaratory, equitable and mandamus relief. Appellants alleged therein that Lancaster County's current method of determining real property assessments violates the uniformity of taxation requirement found in Article VIII, Section 1 of the Pennsylvania Constitution, and violates the objective of Section 7(d) of what is commonly referred to as the Third Class County Assessment Law [2] "to accomplish equalization with other similar property within the taxing district." 72 P.S. § 5348(d). Appellants also alleged that Lancaster County's implementation of recent reassessments in ten of its sixty municipalities is in derogation of Section 402(a) of The General County Assessment Law,[3] which prohibits a county from levying any "real estate taxes on a county-wide revised assessment of real property until it has been completed for the entire county."

In response, the County of Lancaster (County), a county of the third class, its Board of Commissioners, its individual Commissioners and its Board of Assessment Appeals (Board), referred to collectively as Appellees, filed an answer and motion for judgment on the pleadings. Common Pleas issued an opinion and order August 19, 1988, granting Appellees' motion as to those portions of Appellants' complaint requesting that Common Pleas declare a violation of Article VIII, Section 1 of the Pennsylvania Constitution, a

---

1. Appellants in this matter are the City of Lancaster, Township of Fulton, Township of West Lampeter, Borough of Marietta, Borough of Strasburg, Arthur E. Morris, George K. Brinton, Gladys A. Brinton, Paul M. Sload, Edith M. Sload, Gerald T. Horn and Shirley A. Horn.

2. Act of June 26, 1931, P.L. 1379, *as amended*, 72 P.S. § 5348(d).

3. Act of May 22, 1933, P.L. 853, *as amended*, 72 P.S. § 5020–402(a).

violation of 72 P.S. § 5348(d), and a violation of 72 P.S. § 5020–402(a) on the basis that Appellants cannot seek a "determination of [their] substantive rights ... by way of an action for declaratory judgment." Common Pleas denied Appellees' motion as to the portion of Appellants' complaint seeking a declaration that the County's assessment program constitutes a de facto county-wide reassessment, leaving that issue for future adjudication. Further, Common Pleas allowed Appellants' equitable relief and mandamus claims to remain, and granted Appellants leave to file an amended complaint.

An amended complaint was filed on September 8, 1988 and contained four Counts, three in equity and one in mandamus. In Count I, Appellants alleged that the County's assessment procedures for all new assessments violate the uniformity requirement of the Pennsylvania Constitution and asked Common Pleas to enjoin these procedures, to roll back the new assessments in the reviewed districts and to order new assessments in the reviewed districts and a county-wide reassessment. In Count II, Appellants alleged that the County's assessment procedures violate the equalization requirement in 72 P.S. § 5348(d), and they sought the same relief as in Count I. In Count III, Appellants alleged that what the County has done in reviewing and reassessing certain districts' assessments amounts to a de facto county-wide reassessment, thereby violating the requirement in 72 P.S. § 5020–402(a) that such taxes may not be levied until the reassessment is completed for the entire county. Appellants sought the same relief in Count III as in the first two. In Count IV, Appellants alleged that the County Commissioners have refused to perform their tax assessment duties as required by Pennsylvania law, and sought an order in the nature of mandamus directing the roll back of taxes in the reviewed districts, and the adoption of a uniform assessment system as part of a complete county-wide reassessment. Appellees responded by filing preliminary objections, which were overruled by Common Pleas' order of November 21, 1988.

Following discovery, a non-jury trial was held in August and September, 1989. Common Pleas issued an Adjudication and Order, dated March 28, 1990, denying all Counts of Appellants' amended complaint and dismissing the County, the Board of Commissioners of the County, James E. Huber, Brad S. Fischer and Robert H. Brenneman as improper parties to the mandamus Count IV.

Appellants filed a timely motion for post-trial relief, which Common Pleas denied by Opinion and Order dated September 12, 1990. This appeal followed.

Appellants argue that Common Pleas abused its discretion, committed an error of law, or reached a decision not supported by substantial evidence in (1) ruling that the County's assessments did not violate the uniformity requirements of Article VIII, Section 1 of the Pennsylvania Constitution; (2) ruling that the County's actions did not violate the equalization requirements of 72 P.S. § 5348(d); and (3) ruling that the County's implementation of reassessments in ten of its sixty municipalities did not violate 72 P.S. § 5020–402(a).

The last county-wide reassessment was conducted in Lancaster County in 1960 and became effective on January 1, 1962. At that time there were 82,890 parcels of taxable real estate in the County. Between 1962 and 1989, the number of taxable parcels of real estate in the County increased to 153,706. The County has 60 taxing districts. Pursuant to Section 7 of the Third Class County Assessment Law, 72 P.S. § 5348, the Board must annually examine and revise the assessments and finalize the annual assessment roles by July 15. Real property is assessed at a value based upon a ratio established and determined by the Board of County Commissioners, not to exceed 100% of actual value. Actual value is determined by utilizing either the current market value or a base year market value.[4] The Board presently assesses properties using 1960 as its base year and determines a property's assessed value by

4. Market value is the value resulting from a willing buyer and a willing seller under no force or impulse to buy or sell the property.

applying a predetermined ratio of 100% of the property's base year market value.[5] If an assessment is appealed, the court determines the property's current market value for the tax year at issue and the common level ratio.[6] The court then applies the predetermined ratio to the property's current market value "unless the common level ratio varies by more than fifteen percent from the established predetermined ratio, in which case the court shall apply the common level ratio to the current market value of the property for the tax year in question." 72 P.S. § 5350(a).

The three basic approaches for determining actual value are the cost approach, the sales comparison approach, and the income approach. Using the cost approach, the value of a property is determined by estimating the construction cost,[7] subtracting accrued depreciation,[8] and adding the estimated land value. Under the sales comparison approach, the value of a property is estimated by analyzing the sales prices of similar properties. Finally, the income approach involves estimation of a property's value based upon the projected income of the property. Of course, the County must utilize 1960 values in performing all of these calculations.

Carl Pallas, head of the appraisal department of the Lancaster County Assessment Office, testified that, under the County's current assessment scheme, events which may

5. Between 1962 and 1985, the County applied a predetermined ratio of twenty-five percent, which was increased to the maximum 100% beginning in 1985.

6. Common level ratio is the ratio of assessed value to current market value. The ratio is calculated annually for the County by the State Tax Equalization Board (STEB) from information provided to STEB by the County of the preceding year's arms-length transactions, pursuant to the Tax Equalization Act of June 27, 1947, P.L. 1046, as amended, 72 P.S. §§ 4656.1–4656.17. The County's common level ratios for the years 1985–88, as calculated by STEB, are as follows: 1985 (23.7%); 1986 (22.7%); 1987 (21.8%); and 1988 (21.4%).

7. Construction cost is essentially replacement cost, which is determined by use of cost tables that contain the costs of different construction types, components and features.

8. Accrued depreciation is the difference between the current construction cost and the market value of the property.

trigger the review of and possible change to an assessment of property included the sale, subdivision, remodeling of or addition to a property, new construction or economic changes in a community or neighborhood. The Board may become aware of these events through the investigation of building permits, sales that take place within the County, appeals taken or telephone calls made by taxpayers and by door to door canvassing. Mr. Pallas testified that checks of new construction are made by the County's appraisers by driving around the County approximately four times per year. He also testified that in all probability if a property had not been sold or issued a building permit since 1962, its assessment would not have been changed.

Prior to 1980, the County's Assessment Office contracted out the appraisal portion of its work to the Cole, Layer & Trumble Company (CLT). In 1980, the County terminated its contract with CLT, took over the appraisal responsibilities and has continued to handle the assessments up to the present. Substantial demographic changes have occurred in the County since 1960. The number of taxable parcels have nearly doubled. New types of properties have been added to the County's tax rolls, such as condominiums, for which the County had no 1960 comparables. Significant, non-uniform changes in market values of properties throughout the County, significant changes in zoning, as well as a shift from downtown shopping to suburban shopping centers, have occurred.

In 1984, the County held a series of meetings [9] to address concerns of the various segments of the community regarding the County's plans to increase its then 25% assessment ratio and to address its consideration of performing a county-wide reassessment. The minutes of the February 22 meeting with officials of the School Boards and municipalities indicate that an overwhelming majority were in agreement concerning the inequities of the County's present

9. County officials met with the School Boards and municipalities on February 22, 1984; with the farming representatives on March 22, 1984; with the general public on March 30, 1984; and with business, industry and commerce on April 6, 1984.

taxing scheme and were in favor of a county-wide reassessment. During a question and answer period at that meeting, the question was presented: "Is there no alternative other than a county-wide reassessment." The response was: "One option explained was spot reassessment, which is considered to be a 'band-aid' type approach, and would not address the whole problem comprehensively." During a question and comment period at the March 22 meeting with farming representatives the following discussion occurred:

*Comment.*

If you compare pieces of real estate in Lancaster County, the assessed value is not really close to each other—it can vary so much for almost equal pieces of real estate.

*Response.*

The main purpose for reassessment is to clear up the inequities which presently exists [sic].

*Question.*

Why are the properties out of line so much. I don't think our tax assessment office has been that far off. For 3–4 million dollars—I can't see where you benefit.

*Response.*

A reassessment hasn't been done for 20 years. There are a lot of inequities within the present system, and it is becoming more wide-spread. A reassessment can not be done on a piece-meal basis.

Following these meetings, and an examination by the County of the costs and benefits of a county-wide reassessment, along with input from various public officials and experts, the County decided not to conduct a county-wide reassessment. The County concluded that the cost of a complete reassessment outweighed the benefits.

Instead, the County opted to develop "a program of increased maintenance" by computerizing and hiring additional staff. Leo Grasser, Director of the Lancaster County Assessment Office, testified that in order to improve the quality of the assessment program in the County his staff "made recommendations to the Board of Assessment Ap-

peals to perform ratio studies, try to find those districts that appear to be out of line with the rest of the County and go in and review the districts on a property by property basis." Between 1986 and 1988, the County reviewed the districts of Adamstown Borough, Marietta Borough, Fulton Township, Columbia Borough, Christiana Borough, Brecknock Township, Sadsbury Township, Terre Hill Borough, Conoy Township, and Little Britain Township. Mr. Grasser stated that these areas were chosen for review because each was determined to have a common level ratio 15% greater or less than the common level ratio for the County.

Common Pleas found that the Board's appraisers examined every property in each of the reviewed districts, utilizing the same procedure as that used previously by the Board for all of its new assessments and assessment reviews since 1979 and the same procedure utilized by CLT from 1960 to 1979. As a result of these reviews, assessments were changed and implemented beginning in 1987.[10]

Appellants first argue that the County's actions violate the uniformity requirements of Article VIII, Section 1 of the Pennsylvania Constitution. That provision states that: "[a]ll taxes shall be uniform, upon the same class of subjects, within the territorial limits of the authority levying the tax, and shall be levied and collected under general laws."

The Pennsylvania Supreme Court has held that taxation is not a matter of exact science and that absolute equality or perfect uniformity is not necessary to satisfy the constitutional requirement of uniformity. *Columbia Gas Transmission Corporation v. Commonwealth*, 468 Pa. 145, 360 A.2d 592 (1976). The test of uniformity is whether there exists a reasonable distinction and difference between classes of taxpayers sufficient to justify different tax treatment. *F.J. Busse Company v. Pittsburgh*, 443 Pa. 349, 279 A.2d 14 (1971). It is the burden of the taxpayer

10. According to Common Pleas' Finding of Fact No. 31, there was an 8.5% to 40.7% increase in the total assessment value of the properties in seven of the reviewed districts.

alleging a violation of the uniformity clause to show that there is deliberate discrimination in the application of the tax or that it has a discriminatory effect. *Butler Area School District Appeal*, 100 Pa.Commonwealth Ct. 452, 515 A.2d 326 (1986), *petition for allowance of appeal denied*, 516 Pa. 643, 533 A.2d 714 (1987).

■ Appellants argue that the County's selective reassessment in the ten districts was arbitrary and resulted in unequal tax treatment. Appellants maintain that, contrary to Common Pleas' finding, the procedure used for reviewing the properties in the ten districts differs from that which had been previously used by CLT in arriving at assessments in the county's other fifty districts. On cross examination, Mr. Grasser testified as follows regarding the new assessments:

Q. How are you arriving today at 1960 market values?
A. We're using the same procedures that were established by [CLT] for the 1962 reassessment program.

　　·　　　·　　　·　　　·　　　·

Q. You're using the same tables?
A. The updated tables that were provided by CLT, yes.
Q. Are they the same tables as were used in 1962?
A. They get the same results, yes.
Q. If they get the same results why did you change ninety-five percent of the parcels in Adamstown?
A. Because of the economic conditions that might have taken place through the years since 1960 to 1986, or whenever that review was made.

　　·　　　·　　　·　　　·　　　·

Q. If [a] property remained the same over the years with no physical changes, how could it be worth twenty thousand dollars in 1962 as a true market value but in 1989 suddenly be worth, again in 1960 terms, thirty-five thousand dollars?
A. Because of the economic conditions that were reviewed at the time of the review.

　　·　　　·　　　·　　　·　　　·

Q. If [CLT] used the same cost tables as you folks, and you both have the same objective, how do you get to a seventy percent difference in the result?

A. Because its the opinion of the appraiser when he is out there reviewing the property as to his opinion of the 1960 market value as it stands at the time of the year he does it.

. . . . .

Q. Mr. Grasser, isn't it a fact that what your office is doing is applying a formula of current market value times common level ratio to get your benchmark, your end point of where you think the assessment ought to be for a property?

A. We're using it as a tool to get us there.

. . . . .

Q. [I]s it not true, that you can get to any end number that you want using those cost tables? It all depends on what grade you assign, what depreciation you assign, what plus or minus factor you assign, right?

A. To get to the appraiser's opinion of value, yes.

. . . . .

Q. It would be a violation of the obligation of uniformity to assess a property based on current market value if the County purports to use a 1960 market value?

A. If the County uses a 1960 market value, that's right.

Appellants argue that the County's reliance on current market values and common level ratio in performing the reassessments, when these factors were not considered in prior valuations of property was a violation of the uniformity requirement. In support of its finding to the contrary, Common Pleas opined that the consideration of current market value is mandated under 72 P.S. § 5348(d). Subsection (d) states in pertinent part: "In arriving at actual value, the price at which any property may actually have been sold, either in the base year or in the current taxable year, shall be considered but shall not be controlling."

We believe Common Pleas has misinterpreted this subsection. First, a county must choose to utilize either current market value or base year market value in determining a property's actual value to in turn use in arriving at a property's assessed value. 72 P.S. § 5348(c). Second, subsection (d) merely states that if a property is actually sold, the price at which it was sold either in the base year, if using base year market values, or in the current taxable year, if using current market values, must be considered. This language does not provide authority for a county that utilizes base year market value to suddenly begin injecting current market value into the formula in a selected group of taxing districts without applying the same methodology to all property in the county.

Additionally, Common Pleas cited to this Court's decision in *Butler* for support. Again, Common Pleas' reliance on *Butler* is misguided. The issue therein, with which we are not dealing today, was whether a different method of assessment applied only to those taxpayers who appeal contravened the uniformity clause of the Pennsylvania Constitution.

Appellants presented evidence and it was admitted by Carl Pallas, head of the County's appraisal department, that the Board subjectively changed the building grades and depreciation factors with respect to a great number of the properties, without regard to whether there had been any physical change to the properties since their previous assessment. Mr. Grasser did not deny his office having done this but simply maintained that this practice is acceptable. Common Pleas discredited testimony offered by appellants to the contrary and further stated that "there is no statutory prohibition to making such adjustments, and we believe the requirement of 72 P.S. § 5348(a) to increase or decrease annually reviewed assessments grants the Board the authority to make such adjustments." Common Pleas also cited to our Supreme Court's decision in *Hammermill Paper Company v. Erie*, 372 Pa. 85, 92 A.2d 422 (1952), *cert. denied*, 345 U.S. 940, 73 S.Ct. 831, 97 L.Ed. 1367 (1953), as

holding that "[a] difference in the methods or yardsticks or formulas used in ascertaining and determining actual or market value does not prove lack of uniformity if there is a reasonable, practical and just basis for the application of different methods or formulas." *Id.*, 372 Pa. at 98, 92 A.2d at 429.

First, we point out that nowhere in 72 P.S. § 5348(a) is the Board granted wholesale authority for making unsubstantiated adjustments to the building grades and depreciation factors on selected properties. Second, the *Hammermill* case is not applicable to the matter at hand. The assessment methodology challenged therein had been applied equally to all properties in the same class. Here, obviously, the challenge involves different methodologies being applied to properties in the same class.

■ Appellees argue that "value corrections may be made to an individual parcel of land for a particular year without requiring that all properties in the county be reassessed that year," citing to *Carino v. The Board of Commissioners of the County of Armstrong*, 79 Pa.Commonwealth Ct. 242, 246, 468 A.2d 1201, 1203 (1983). We note that *Carino* lends no support for Appellees' argument. The "value corrections" referred to by the Court encompassed "periodic changes in the valuation of *individual* parcels" as a result of the addition or removal of improvements, physical changes in the land or significant changes in the economy affecting real estate values. *Id.*, 79 Pa.Commonwealth Ct. at 245, 468 A.2d at 1203 (emphasis in original).

Therein, the appellant contended that the Board of Commissioners of Armstrong County was required to conduct a county-wide revised assessment on an annual basis pursuant to The Fourth to Eighth Class County Assessment Law.[11] The issue was one of statutory construction and not a constitutional challenge such as we have here. We held, based on our interpretation of the statute, that such a county-wide review was discretionary and need not be conducted on an annual basis. Interestingly, we alluded to the

11. Act of May 21, 1943, P.L. 571, *as amended*, 72 P.S. §§ 5453.101–5453.706.

fact that a different result might have been reached had the appellants argued that the Board fraudulently failed to exercise its discretion.

■ Common Pleas appeared to give considerable weight to the Coefficient of Dispersion (COD) [12] as an indicator of whether the constitutional requirement of uniformity was satisfied and as a factor in determining whether a county-wide reassessment was necessary. According to Common Pleas' finding of fact No. 24, the COD is a commonly used measure for the comparison of an individual property's common level ratio to the common level ratio for a given area. It found that "[a] COD of twenty percent is recognized as being good or tolerable," and that the COD for the county was 26.4% in 1985, 26.9% in 1986, 24.8% in 1987 and 17.8% in 1988. (Findings of Fact Nos. 25 and 32.)

Appellants maintain that there was no evidence produced to show that a COD of 20% was considered acceptable by the assessment industry for all types of property within a county. In support of its finding, Common Pleas cited to Exhibit P–40, which is a publication by the Research and Technical Services Department, International Association of Assessing Officers (IAAO) [13] entitled Evaluating Real Property Assessment Practices, a Management Guide. Therein, it states:

> Coefficients of dispersion can and should be computed for various classes, neighborhoods, and other selected property groups. When they are calculated for single-family residential properties, a high or commendable degree of

12. The COD is a statistical tool, expressed as the average percentage deviation between the ratio of a property's assessed to market values and the County's common level ratio. For example, a COD of 20 indicates 20% average deviation between the assessed to market values of properties sold in a given year and the County's common level ratio.

13. Edgar Hayes, Jr., accepted by Common Pleas as an expert in the field of assessment and uniformity of assessment testified that the IAAO publishes the most commonly accepted assessment standards used in the industry and strives for the objective of "[i]mplementing and maintaining fairness and uniformity of property valuation for tax purposes."

assessment uniformity is indicated by CODs in the range of 5.0–15.0, depending on the nature of properties. In areas containing newer and relatively similar homes, CODs at the lower end of the range are obtainable. In areas containing older and relatively dissimilar homes, CODs at the upper end of the range typically indicate good performance.

These standards can be relaxed somewhat in the case of vacant lots, farm property, and acreage, partly because sales prices tend to be less predictable. On these properties, CODs of up to 20.0 may indicate acceptable assessment uniformity. In the case of income producing properties (excluding farms), the 5.0–15.0 objective should be attainable.

*Id.* at pp. 4–5. We are in agreement with appellants that there is not substantial competent evidence of record to support Common Pleas' finding regarding the acceptable COD and that such finding was in error. In accordance with the text quoted above, assuming the acceptable maximum is fifteen percent for all but infrequently sold properties, then the evidence produced by the County shows that it has not been able to attain that maximum.

■ It is apparent to this Court that the overwhelming evidence in this matter indicates that, as a matter of law, the County's taxing scheme is outdated and replete with inequities. Charles Orberg, a member of the American Institute of Real Estate Appraisers, testified:

Q. Mr. Orberg, in your opinion, sir, could one accurately or uniformly attempt to assess real estate in Lancaster County today for its 1960 market value?

A. In my judgment it would be virtually impossible.

Q. Why is that?

A. Well ... any appraisal of real property takes into account, among other things, economic conditions that would apply as of the date of appraisal. In order to do an appraisal of a piece of property in any community as of 1960 or as of any date in the past one must reflect the economic conditions, supply and demand forces, land use

patterns, and all of the factors that would impact on value as of the date of appraisal. And because there have been so many changes in the market place, so many physical changes in real estate in general in Lancaster County, particularly, it would be virtually impossible in my opinion to do an appraisal of a property as of 1960.

Further, Mr. Pallas, head of the County's appraisal department, testified:

Q. Do you have in your office comparables showing 1960 market value for property?

A. Do we have what?

Q. Do you have actual comparables of the type which Mr. Orberg testified to that an appraiser would use to establish what similar properties were selling for in 1960?

A. Do we have comparables you mean of—

Q. Yes, 1960 sales.

A. No, we don't.

Edgar Hayes, Jr., appellants' expert in the field of assessment and on the issue of uniformity of assessment, testified as follows:

Q. Does the IAAO address the question of how frequently reassessments should be done in order to achieve the objective of fairness?

A. Yes. I wouldn't call it at standard but rather a goal in a sense that oftentimes the cyclical nature of reappraisal is undefined in many places.

Q. What does the IAAO recommend?

A. Annual assessments are most desirable.

Q. What does it recommend as an alternative?

A. Alternatively, they would recommend cyclical reassessments in from two to maybe as much as six-year periods.

. . . . .

Q. Does the IAAO have recommendations, standards, guidelines, whatever, concerning changes to grade and depreciation once they have been established at a given assessment?

A. They have a series of dissertations on all the topics related to assessment, data characteristics being one, quality grading as relates to the cost approach, to value as seen to establish it, and then don't change it until such time as you're undergoing a reassessment potentially for everybody. The theory is because quality grade and things like depreciation and functional obsolescence ... are the major characteristics to permit one to adjust values. And so if you create a standard ... where you can just arbitrarily at any time [determine] the quality grade is wrong, or ... the depreciation is wrong, and change it, in essence you have no procedure....

Q. Would a lapse of twenty-seven years ... between reassessments, be considered acceptable by the IAAO?

A. Of course not.

Further, we emphasize that this is not a case involving the re-valuation of a single property or properties based on improvements or other specific changes in circumstances but a general re-valuation of large areas of property apparently in an effort to show a better overall picture in terms of percentages and to obviate the need for reassessing all properties at a higher cost. We believe that such a partial re-valuation clearly created the probability that two standards of valuation would be used and that there would result an uneven allocation of the tax burden.

This Court, in reaffirming the long-standing policy of allocating taxes on an equitable and comprehensible basis, quoted the Pennsylvania Supreme Court as follows:

While every tax is a burden, it is more cheerfully borne when the citizen feels that he is only required to bear his proportionate share of that burden measured by the value of his property to that of his neighbor. This is not an idle thought in the mind of the taxpayer, nor is it a mere speculative theory advocated by learned writers on the subject, but it is a fundamental principle written into the constitutions and statutes of almost every state in this country.

*Kenney v. Keebler Company,* 53 Pa.Commonwealth Ct. 507, 512, 419 A.2d 210, 212 (1980) (quoting *Delaware, Lackawanna & Western Railroad Co.'s Tax Assessment (No. 1),* 224 Pa. 240, 243, 73 A. 429, 430 (1909).

We conclude that, as a matter of law, the County, in singling out ten of the County's taxing districts, in utilizing a different method of assessment on the properties in those districts, and in making unsubstantiated wholesale adjustments to grade and depreciation factors of certain of those properties, violated both the uniformity requirement of Article VIII, Section 1 of the Pennsylvania Constitution and the equalization requirement of 72 P.S. § 5348(d).

Although we have decided this matter on constitutional grounds, we will address appellants' remaining argument that the County's review and reassessment of these districts is in effect a county-wide reassessment being performed in a piecemeal fashion. Appellants point out that Roger Downing, a research associate at the Pennsylvania State University and one of the experts hired by the County while doing its reassessment study, testified under cross examination as follows:

Q. Based on your discussions with Mr. Grasser, you said that Lancaster County has been reassessing under its maintenance program over the years, didn't you?

A. We were doing some reassessments.

Q. You understand it to be a reassessment of the entire county, don't you?

A. It just depends how you look at it. There isn't any definition in the law of what a reassessment is.

Q. Didn't you tell me that based on your discussions you understand Lancaster County to be doing a reassessment of the entire county?

A. Yes, you can take that to be it.

Common Pleas concluded that what the Board did in the reviewed districts does not constitute a de facto reassessment because, in its opinion, the Board's actions are precisely those prescribed by 72 P.S. § 5348(a), which requires the

Board to examine its annual assessments, and to increase or decrease them as it believes proper. Common Pleas cites to *Carino* in support of its reasoning that "where the dynamics of an economy require periodic changes in property evaluations, those changes must be made without necessitating a county-wide reassessment." It also cites to our Pennsylvania Supreme Court's decision in *Deitch Company v. Board of Property Assessment*, 417 Pa. 213, 209 A.2d 397 (1965) as holding that "where under-assessments and over-assessments exist, assessors must act to correct them as expeditiously as possible." Common Pleas believes that these cases provide authority for the Board's selective reassessment in the ten districts. We disagree. Both of these cases are factually inapposite to the instant matter. What the County did here goes beyond the typical periodic re-valuation attendant to a county's taxing scheme and that which was decided in *Carino* and *Deitch*.

█ Further, Common Pleas notes that the County's review and reassessment in only ten of its sixty taxing districts and its lack of immediate plans for any further reviews are not evidence of a de facto county-wide reassessment sufficient to invoke the provisions of 72 P.S. § 5020–402(a). We are not in agreement for a number of reasons.

As is evident from the record in this matter, County officials have acknowledged the need for a re-valuation of all property within the County to bring its system up to date and to clear up the inequities and publicly denounced any band-aid approaches. However, at some point in time, the County decided, mostly for cost reasons, not to pursue a total reassessment but instead to continue its present assessment system, perform a partial reassessment, and address inequities through the appeals process. This resulted in a review and reassessment in ten taxing districts of not only the properties that would have come up for reassessment in the ordinary course of the system but of every property in the ten selected districts. Mr. Grasser testified that under the selection criteria applied numerous other

districts in the County qualified for review and reassessment but were not reviewed.

Q. Under the criteria of fifteen percent plus or minus, which you said you established, you didn't uniformly apply that to all municipalities in the County?

A. As I said, as we are going along we only have so many personnel to do this job, so we only do so many districts a year. So at that point we have to look at the information we have available to us and try to pick the ones that we felt were most out of line.

He testified that the districts qualifying for review in 1985 but not reviewed included East Earl Township, Strasburg, East Petersburg and Lititz. Columbia fell within the accepted guidelines, but nevertheless was reviewed. In 1986, Earl Township, Manheim Borough, Leacock Township, Strasburg Township, Salisbury Township, Conoy Township, and East Lampeter Township qualified for review but were not reviewed. In 1987, Leacock Township, Martic Township, Paradise Township, Caernarvon Township, Strasburg Township, and Lancaster City qualified, but were not reviewed. In 1988, East Donegal Township, East Cocalico Township, and Upper Leacock Township qualified for review but were not reviewed.

Although this is a difficult question, and the evidence not as compelling as that before us in *Croasdale v. Dauphin County Board of Assessment Appeals*, 89 Pa.Commonwealth Ct. 409, 492 A.2d 793 (1985), we must conclude that the County's present plan to update its assessment program constitutes a de facto county-wide assessment. Were we to accept Common Pleas' interpretation of 72 P.S. § 5348(a), we would be rendering the provisions of 72 P.S. § 5020–402(a) meaningless. Obviously, counties could perform county-wide reassessments in portions, realizing the increased revenues from each portion prior to finishing the review for the entire county thereby circumventing the prohibition of 72 P.S. § 5020–402(a). We believe that such an absurd result was not intended by the legislature in its enactment of the two sections at issue.

 It is our belief, based on facts of record, that the County implemented the present system of reassessment in lieu of a complete reassessment in order to avoid the expense of the latter. We sympathize with the County in that a total reassessment is a costly undertaking. However, where, as here, there has not been an assessment of the entire County since 1960, there can be no uniformity of assessment. Moreover, cost is not a relevant factor in determining whether a county's taxing scheme is in accordance with the uniformity requirement of the Pennsylvania Constitution.

The evidence demonstrates that the Board's plan is a county-wide reassessment by another name. Therefore, the County's levying on the assessments in the ten districts is a violation of Section 402(a) of the General County Assessment Law.

 Appellees argue that mandamus relief is not proper in this instance because adequate remedies are provided to the aggrieved taxpayers through the appeals process. Mandamus is an extraordinary writ, which may only be granted to compel the performance of a ministerial act or mandatory duty where there exists a clear, legal right in the plaintiffs, a corresponding duty in the defendants, and a want of any other adequate remedy. *Carino.* "[M]andamus will not lie to compel the performance of discretionary acts except where the failure to exercise discretion is arbitrary, fraudulent or based on an erroneous view of the Law." *Carino,* 79 Pa.Commonwealth Ct. at 244, 468 A.2d at 1202.

 We have held that where the statutory remedies are clearly adequate and the facts of a case fail to rise to the level necessary to invoke equity, mandamus will not lie. *Kenney; Runyan v. Board of Assessment Appeals,* 43 Pa.Commonwealth Ct. 86, 401 A.2d 870 (1979). Appellants argue that here there is no adequate remedy through the appeals process because the inequality created by the county's recent re-valuations pervades the entire taxing scheme.

We agree. The facts here speak for themselves. To force every aggrieved taxpayer to assume the task of appealing, when the larger question can be expeditiously and efficiently resolved in a single action, would be unnecessarily burdensome on both property owners and the judicial system.

We wish to state here that it is not the intention of this Court to criticize Mr. Grasser, Mr. Pallas, the County Commissioners or the Common Pleas court in the performance of their duties and that we are mindful of the political ramifications involved. However, the County's taxing scheme is constitutionally infirm and the necessary reform cannot be ignored.

Accordingly, the opinion and order of Common Pleas is reversed. Further, Appellees are directed to (1) implement a county-wide reassessment plan, pursuant to a court enacted time frame; and (2) reinstate in the ten reviewed districts, prospectively only (i.e. no refunds), the assessments which existed prior to the reviews of 1986–1988, except in the individual cases already resolved through the appeals process or in which appeals have been timely filed, but not yet adjudicated.

PELLEGRINI, J., did not participate in this decision.

KELLEY, J., dissents.

### ORDER

AND NOW, this 15th day of November, 1991, the order and opinion of the Court of Common Pleas of Lancaster County in the above-captioned matter is reversed. Further, Appellees are hereby directed to (1) conduct a reassessment of all properties in Lancaster County; and (2) reinstate in the ten reviewed districts, prospectively only, the assessments that existed prior to the reviews in 1986–1988, except in the individual cases where the assessments were resolved through the appeals process.

The matter is remanded to the Court of Common Pleas of Lancaster County with directions that the court conduct

hearings to determine what would be a practical, efficient, and feasible time frame for the completion of a county-wide reassessment. Following the hearings, the court is directed to establish dates for the commencement and completion of such reassessment and to effectuate compliance with the dates set for completion.

Jurisdiction relinquished.