# Smith v. Carbon County Board of Assessment Appeals

*Francis J. Hoegen,* for appellant.
*Daniel A. Miscavige,* for appellee.
*Laura A. Schelter,* for intervenor Jim Thorpe Area School District.

NANOVIC, *P.J.,* May 29, 2009—By deed dated October 16, 2006, Christopher Smith purchased condo-

minium unit no. F201 at Midlake on Big Boulder Lake for $275,000. At the time of purchase, the unit had an assessed value of $50,300. Thereafter, prompted by the recent purchase price, the Jim Thorpe Area School District filed a statutory appeal to the Carbon County Board of Assessment Appeals challenging the property's assessed value for the 2008 tax year. The board sustained the appeal and increased the assessed value by over 75 percent to $88,141. On the basis of the county's common-level ratio of 32.1 percent, this reflected a fair market value of $275,000, an amount equal to the price paid by Smith.[1] Smith has appealed the board's decision to this court.

## FACTUAL BACKGROUND

Midlake is a residential condominium development formed in 1988 and located in Kidder Township, Carbon County, Pennsylvania. It consists of 132 two-bedroom condominium units located in nine separate buildings: five buildings with 12 units each and four buildings with

---

1. Carbon County is a county of the sixth class. Accordingly, Smith's appeal is governed by The Fourth to Eighth Class County Assessment Law, 72 P.S. §§5453.101-5453.706, and, to the extent not inconsistent with such enactment, The General County Assessment Law, 72 P.S. §§5020-101—5020-602. The property is located within the Jim Thorpe Area School District.

Section 102 of The Fourth to Eighth Class County Assessment Law, 72 P.S. §5453.102, defines the term "common-level ratio" as "the ratio of assessed value to current market value used generally in the county as last determined by the State Tax Equalization Board (STEB) pursuant to the Act of June 27, 1947 (P.L. 1046, no. 447), referred as the State Tax Equalization Board Law."

18 units each. The units are divided between those with 1,096 square feet of living space, located on the first two floors of each building, and those with a loft and 1,315 square feet of living space, located on the third floor of each building. There are a total of 88 smaller units and 44 larger units. The smaller units, which include the unit owned by Smith, and are the units Smith compares his property to, have identical floor plans and are mirror images of one another.

Forty-two of these smaller units, almost 48 percent of the total, have an assessed value ranging between $49,300 and $50,300. An additional five, approximately 6 percent of the total, have an assessed value ranging between $53,430 and $64,781. Of these 47 units, 43 were acquired prior to January 1, 2004, and four since that date. For 24 of the units transferred prior to January 1, 2004, those which Smith's real estate expert associated with bona fide purchase prices, the average assessed value is $51,991.67.[2] The average sales price for these same 24 units is $118,395.83.

---

2. The report submitted by Smith's real estate expert states that the bona fide sales price for a number of the sales prior to January 1, 2004, could not be determined for various reasons. According to the report, the public records indicate no sales price or deed dates for those units occupied by the original owners and several of the deeds (*i.e.,* six) state only a nominal $1 consideration. Additionally, Smith's expert described two of the sales as likely distress sales with sale prices of $75,000 and $40,000. These refer to Units E191 and F207 respectively. Although criticized by the school district for excluding transactions which are not at arm's length, this approach is similar to that taken by the State Tax Equalization Board, which develops and calculates an annual common-level ratio for each county based upon real estate transfers involving bona fide selling prices, supplemented by independent ap-

Since January 1, 2004, 36 units, including two of the four units referred to in the previous paragraph, have been transferred in what appear to be arm's length transactions.[3] The assessed value for the units transferred since January 1, 2004, range between $49,500 and $118,500, with the average being $83,122.69. This is a 60 percent increase in the average assessed value from those similar units acquired prior to January 1, 2004.

The most recent six sales of the smaller bedroom units occurred between July 1, 2007, and June 23, 2008 (the date of the most recent sale provided). The prices for these properties range from $225,000 to $275,000, with the average being $249,250. The average assessed value is $69,009.17.

Primarily on the basis of this information, Smith contends that the revised assessment for his property is excessive and discriminatory in relation to comparable properties in Midlake and should be set aside for one or more of the following reasons: (1) as a spot assessment; (2) because the same methodology for assessing comparable properties has not been utilized by the board; and

---

praisal data and other relevant information. See 61 Pa. Code §603.31(b).

3. These two units, Units H228 and H234, each have an assessed value of $49,500. Unit H228 was sold on or about March 21, 2006, for a price of $281,500; Unit H234 was sold on or about October 12, 2007, for a price of $275,000. The two other units transferred since January 1, 2004, with assessed values less than $50,300 were not considered to be arm's length transactions by Smith's real estate expert. The deeds for these two sales each show a nominal consideration of $1: Unit G219 conveyed on or about December 7, 2005 and Unit B156 conveyed on or about January 27, 2005.

(3) because the constitutional requirements of uniformity and equal protection have been violated. Each of these grounds is addressed below.

## DISCUSSION

### 1. *Spot Assessment*

"As a general proposition, selective reassessment or 'spot reassessment' by a body clothed with the power to prepare or revise assessment rolls, value property, change the value of property, or establish the predetermined ratio is improper." *Vees v. Carbon County Board of Assessment Appeals,* 867 A.2d 742, 747 (Pa. Commw. 2005), *appeal denied,* 595 Pa. 713, 939 A.2d 891 (2007). Spot assessments are those initiated by a body possessing the power to assess or reassess, which generally involve a limited or narrow group of properties, and which create such a disparity or disproportionality in the tax burden between the affected properties and other similar or comparable properties in the taxing district that there exists either a violation of the Uniformity Clause of the Pennsylvania Constitution or the Equal Protection Clause of the United States Constitution, or both.

As a matter of law, neither the taking of an assessment appeal by a taxing body nor the adjudication of such an appeal by an administrative agency is a spot reassessment. See *Vees,* 867 A.2d at 746-48. In neither case are the actions of the taxing body or the board an assessment. In the case of a municipal body filing an appeal, its appeal is the exercise of a statutory right to *review* an assessment made by the county assessor's office of which it feels aggrieved, 72 P.S. §5453.706; in the case of the

board of assessment deciding the appeal, it acts in its statutory capacity to *hear* the appeal, 72 P.S. §5453.702. Accordingly, Smith's challenge on this basis is misplaced and without merit.

## 2. *Methodology*

Under The Fourth to Eighth Class County Assessment Law, real property in the county is originally valued and assessed either by reference to the current market value at the time of assessment or by reference to a prior year upon which the market value of all property in the county is based. See 72 P.S. §5453.602(a).[4] In Carbon County, the base year upon which real property market values are based is 2001, the year in which the county last conducted a countywide reassessment. In contrast, for an assessment appeal, the relevant market value is the property's value as of the date the appeal was filed before the board. See 72 P.S. §§5453.702(b)(1), 5453.704(b)(1).[5]

---

4. Section 602 of the law reads in pertinent part as follows:

"After there has been established and completed for the entire county the permanent system of records consisting of tax maps, property record cards and property owners' index, as required by section three hundred six of the act herein amended, real property shall be assessed at a value based upon an established predetermined ratio (EPR), of which proper notice shall be given, not exceeding 100 percent of actual value. Such ratio shall be established and determined by the board of county commissioners. In arriving at actual value the county may utilize the current market value or it may adopt a base year market value." 72 P.S. §5453.602(a).

5. Section 704 of the law, governing appeals to the court, reads in pertinent part as follows:

"(b) In any appeal of an assessment the court shall make the following determinations:

At this time, the assessed values for approximately half of the smaller units in Midlake have been computed by reference to the base year market value of each unit while the assessed values for the remaining units, those for which an appeal was filed, have been computed by reference to the market value as of the date of the appeal. Smith contends that by using the base year market value multiplied by the established predetermined ratio to assess some properties, and the current market value multiplied by either the established predetermined ratio or the common-level ratio, if the two differ by more than 15 percent, to assess those properties for which an appeal has been taken, two different methods of assessing real estate exist, with the result being disproportionate and unequal treatment of comparable properties. As stated by Smith: the county should not be permitted to use a base year valuation multiplied by a predetermined ratio for some properties and a current market value multiplied

---

"(1) The market value as of the date such appeal was filed before the board of assessment appeals. . . .

"(2) The common-level ratio which was applicable in the original appeal to the board. . . .

"(c) The court, after determining the market value of the property pursuant to subsection (b)(1), shall then apply the established predetermined ratio to such value unless the corresponding common-level ratio determined pursuant to subsection (b)(2) varies by more than 15 per centum from the established predetermined ratio, in which case the court shall apply the respective common-level ratio to the corresponding market value of the property." 72 P.S. §5453.704.

The common-level ratio referred to in subsection (b)(2) is the ratio of assessed value to market value as determined by the State Tax Equalization Board. See 72 P.S. §5453.102 (defining "common-level ratio").

by the current STEB ratio for other properties without violating the constitutional requirement for tax uniformity. (Smith post-trial memorandum, p. 10.)

In denying this challenge, we find it significant first that the difference in valuation methods which Smith criticizes is that directed by The Fourth to Eighth Class County Assessment Law. Compare 72 P.S. §5453.602(a) *with* 72 P.S. §§5453.702, 5453.704. Neither in Smith's petition to this court appealing the decision of the Board of Assessment nor in Smith's post-trial memorandum does Smith challenge the constitutionality of any provision of The Fourth to Eighth Class County Assessment Law or of The General County Assessment Law.

Second, the same challenge made by Smith was rejected by the Commonwealth Court in *Appeal of Armco Inc.,* 100 Pa. Commw. 452, 515 A.2d 326 (1986), *appeal denied,* 516 Pa. 643, 533 A.2d 714 (1987). In *Armco,* the county asserted that section 602 requires one method of assessing real estate, and section 704 requires a different method only as to those taxpayers who appeal. The *Armco* decision and its reasoning behind the two approaches to computing assessed values were recently explained by the Commonwealth Court in *Vees* as follows:

"An en banc panel of this court rejected the county's argument. The court explained that section 602 provides an efficient administrative method of assessing real estate by allowing a county to apply the EPR to base year market value. However, the assessment method is imperfect because base year market value may not reflect current year market value. On the other hand,

section 704 provides a method for reviewing administrative assessments so that they reflect the reality of appreciation or depreciation in property value. Although section 704 reassessments utilize current market values instead of base year market values, the *STEB ratio converts current market values to equivalent base year assessed values.* . . . In other words, the constitutional goal is uniform *assessed* values, and the application of the STEB ratio to current market values under section 704 results in uniform assessed values." *Vees,* 867 A.2d at 752 (Friedman, J., dissenting) (citation omitted) (footnote omitted) (emphasis in original); cf. *Downingtown Area School District v. Chester County Board of Assessment Appeals,* 590 Pa. 459, 475, 913 A.2d 194, 204-205 (2006) (holding that to the extent the statutory scheme for equalization set forth in 72 P.S. §5349(d.2), which is essentially the same as that found in 72 P.S. §5453.704, requires application of the EPR against the fair market value of the property as of the year of the appeal (*i.e.,* to the extent the common-level ratio does not vary by more than 15 percent from the EPR), it creates a class of taxpayers who are subjected to a disproportionately high tax burden, thereby rendering the provision arbitrary and unconstitutional).

### 3. *Uniformity*

The third and final issue is whether the assessed value placed on Smith's property by the board following the school district's appeal results in an assessment which is unconstitutional for lack of uniformity. Smith contends that this assessment, while consistent with the property's current fair market value, imposes a disproportionate tax

burden when evaluated against the assessed value of similar property in relation to its current market value. See *Fosko v. Board of Assessment Appeals, Luzerne County,* 166 Pa. Commw. 393, 400, 646 A.2d 1275, 1279 (1994) ("Where a taxpayer claims that an assessment violates the principle of uniformity, the taxpayer admits that the fair market value assigned to his or her property is correct but that other comparable properties are assigned a substantially lower fair market value and when the ratio is applied to that lower value, the owners of the comparable properties pay less than the complaining taxpayer."); see also, *Cumberland Coal Co. v. Board of Revision,* 284 U.S. 23, 29 (1931) ("Applying the same ratio to the same assigned values, when the actual values differ, creates the same disparity in effect as applying a different ratio to actual values when the latter are the same.").

(a) Defining the Standard of Uniformity

The Uniformity Clause of the Pennsylvania Constitution, Article VIII, Section 1 states, "All taxes shall be uniform, upon the same class of subjects, within the territorial limits of the authority levying the tax, and shall be levied and collected under general laws." Similarly, the Equal Protection Clause of the United States Constitution provides that "No state shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Constitution Amendment XIV Section 1. Significantly, in *Downingtown* the Pennsylvania Supreme Court reiterated that the protection afforded by the Equal Protection Clause is incorporated within the Uniformity Clause and imposes a

floor for assuring uniform assessments. See 590 Pa. at 469, 913 A.2d at 200-201.

The Uniformity Clause views all forms of real estate within the taxing district as comparable for purposes of calculating the appropriate ratio of assessed value to market value.[6] In contrast, the Equal Protection Clause is narrower and requires only that similar properties, those having like characteristics and qualities located within the same taxing district, be treated the same. In analyzing this relationship further, our Supreme Court stated:

"At the outset, while we agree with the trial court that this court has interpreted the Uniformity Clause as precluding real property from being divided into different classes for purposes of systemic property tax assessment, we do not find that this general uniformity precept eliminates any opportunity or need to consider meaningful sub-classifications as a component of the overall evaluation of uniform treatment in the application of the taxation scheme. Indeed, this would represent an imper-

6. In *Deitch Company v. Board of Property Assessment,* the court explained why this is so:

"In determining . . . whether the constitutional requirement with respect to uniformity has been complied with in a taxing district, all properties are comparable in constructing the appropriate ratio of assessed value to market value. This is because the uniformity requirement of the Constitution of Pennsylvania has been construed to require that all real estate is a class which is entitled to uniform treatment. . . . In establishing such ratio in a particular district, the property owner, the taxing authority, and the courts may rely on any relevant evidence." 417 Pa. 213, 223, 209 A.2d 397, 402-403 (1965). (citation omitted)

missible departure from federal equal protection juris-
prudence, which sets the floor for Pennsylvania's
uniformity assessment." *Id.* at 469, 913 A.2d at 200.[7]
Thus, *Downingtown* reaffirms "the prevailing require-
ment that similarly situated taxpayers should not be
deliberately treated differently by taxing authorities." *Id.*
at 470, 913 A.2d at at 201.[8]

### (b) Proving Lack of Uniformity

Under both the Equal Protection Clause and the Uni-
formity Clause, "a taxpayer alleging that the administra-
tion of a tax violates its rights to be taxed uniformly with
others of its class must demonstrate deliberate, purpose-
ful discrimination in the application of the tax before
constitutional safeguards are violated." *Armco,* 100 Pa.
Commw. at 458, 515 A.2d at 329. "It is the burden of the
taxpayer alleging a violation of the Uniformity Clause
to show that there is deliberate discrimination in the ap-

---

7. In permitting uniformity challenges by examining sub-classifi-
cations of similar property within the larger class of real estate gener-
ally, the Pennsylvania Supreme Court also observed:

"In this regard, it must be acknowledged that a tension remains
between this court's decisions which tend to analyze uniformity
solely in terms of a single classification of all real property in a taxing
district, and federal equal protection law, which clearly takes into ac-
count disparate treatment of comparable properties within the broader
classification." *Downingtown Area School District v. Chester County
Board of Assessment Appeals,* 590 Pa. 459, 471 n.11, 913 A.2d 194,
202 n.11 (2006).

8. "In this context, the term 'deliberate' does not exclusively connote
wrongful conduct, but also includes any intentional or systematic
method of enforcement of the tax laws." *Id.* at 470 n.10, 913 A.2d at
201 n.10.

plication of the tax or that it has a discriminatory effect." *City of Lancaster v. County of Lancaster,* 143 Pa. Commw. 476, 486-87, 599 A.2d 289, 294 (1991), *appeal denied,* 530 Pa. 634, 606 A.2d 903 (1992); see also, *Millcreek Township School District v. Erie County Board of Assessment Appeals,* 737 A.2d 335, 339 (Pa. Commw. 1999), *appeal denied,* 563 Pa. 668, 759 A.2d 389 (2000).

"A taxpayer may prove non-uniformity by presenting evidence of the assessment-to-value ratio of 'similar properties of the same nature in the neighborhood.'" *Downingtown,* 590 Pa. at 467, 913 A.2d at 199. In *In re Brooks Building,* 391 Pa. 94, 101, 137 A.2d 273, 276 (1958), the Pennsylvania Supreme Court found that a taxpayer satisfied his burden of proving a lack of uniformity by presenting "evidence of the market value of his property and of similar properties of the same nature in the neighborhood and by proving the assessments of each of these properties and the ratio of assessed value to actual or market value." In *Deitch Company v. Board of Property Assessment,* 417 Pa. 213, 223, 209 A.2d 397, 403 (1965), the Supreme Court further stated:

"The evidence supplied by the taxpayer in *Brooks* illustrates one method by which a taxpayer can meet his burden of proving a lack of uniformity, but we do not consider it to be the only method. It would be equally satisfactory to produce evidence regarding the ratios of assessed values to market values as the latter are reflected in actual sales of any other real estate in the taxing district for a reasonable period prior to the assessment

date. Thus, for example, the taxpayer's expert witness or witnesses could select a number of recent representative sales and offer testimony with respect to such sales as proof of the ratio in the taxing district." See also, *Keebler Company v. Board of Revision of Taxes of Philadelphia,* 496 Pa. 140, 143, 436 A.2d 583, 584 (1981) (permitting the use of sales data to compute the common-level ratio).[9]

---

9. In *Appeal of F.W. Woolworth Company,* 426 Pa. 583, 586-87, 235 A.2d 793, 795 (1967), the Supreme Court held:

"[A] valid study of the ratio of assessed value to market value covering the entire taxing district is the preferred way of determining a common-level ratio. Since uniformity has as its heart the equalization of the ratio among *all* properties in the district, . . . a determination based upon the district as a whole necessarily is more conducive to achieving a constitutional result than one based upon a few properties." (citation omitted) (emphasis in original)

In qualifying this preference, the court in *Keebler Company v. Board of Revision of Taxes of Philadelphia,* 496 Pa. 140, 143, 436 A.2d 583, 584 (1981), explained that because "[p]ractical considerations . . . prohibit the construction of a common-level ratio by way of an evaluation of the assessment and fair market value of each and every parcel of realty in the taxing district," the common-level ratio may be constructed by "any relevant evidence." Further, because *Downingtown* permits tax assessments to be challenged based on a lack of uniformity in the assessment of properties having like characteristics and qualities in the same area, an evaluation of properties throughout the county and the consequent determination of the common-level ratio for the entire county is no longer necessary, at least so far as showing that a lack of uniformity exists. See also, *Chartiers Valley Industrial & Commercial Development Authority v. Allegheny County,* 963 A.2d 587, 592 (Pa. Commw. 2008) (discussing the conclusion in *Downingtown* that tax assessments can be challenged based on a lack of uniformity in the assessment of properties having like characteristics and qualities in the same area).

The Uniformity Clause "requires substantial uniformity, rather than mathematically precise uniformity . . . ." *Clifton v. Allegheny County,* 969 A.2d 1197, 1226 (Pa. 2009). It permits practical inequities and, because taxation is not an exact science, "rough uniformity with a limited amount of variation is permitted so long as the taxing scheme does not impose substantially unequal tax burdens." *Beattie v. Allegheny County,* 589 Pa. 113, 130, 907 A.2d 519, 529-30 (2006). Consequently, inequities in assessment, beyond the practical, which impose substantially unequal tax burdens, violate the Uniformity Clause.

## (c) Applying the Standard

In this case, Smith's condominium unit is one of 88 virtually identical units in Midlake. These units are clearly similar and comparable. A fair estimate of their current fair market value can be taken from the average of the six most recent sales, $249,250. Yet while 48 percent of these units have an assessed value ranging between $49,300 and $50,300, for a ratio of assessed to current market value of approximately 20 percent,[10] the assessed value for Smith's property as determined by the board, $88,141, represents a ratio of assessed to current market value of 35 percent, using the same fair market figure of $249,250.

The range of assessed valuations for all units of the type owned by Smith is between $49,300 and $118,500,

---

10. When measured against Smith's purchase price, $275,000, this ratio is 18.11 percent.

a spread of more than 140 percent. The spread between Smith's unit and the lowest of these assessments, $49,300, is 79 percent. These differences are not explained by any difference in the features of the units or their true values when compared to one another at the same point in time, but primarily because of differences in purchase price over time. The variance in assessments between those properties conveyed prior to January 1, 2004, and those after January 1, 2004, evidence a practice which systematically results in excessive assessments for properties conveyed after January 1, 2004.

Under the standards set by our Supreme Court, a taxpayer's burden is met once he shows non-uniformity in the assessment-to-value ratio between his property and other "similar properties of the same nature in the neighborhood." *Downingtown,* 590 Pa. at 467, 913 A.2d at 199 (comparing the subject property assessed at 100 percent of market value with seven other shopping centers in the county whose ratio of assessed to market value ranged between 34 percent and 69 percent); see also, *McKnight Shopping Center Inc. v. Board of Property Assessment,* 417 Pa. 234, 239, 209 A.2d 389, 392 (1965) (taxpayer "produced uncontradicted testimony that its property was assessed at 88.5 percent of its market value while two other shopping centers were assessed at 57 percent and 76 percent of their market values"); *Brooks,* 391 Pa. at 98, 137 A.2d at 274 (taxpayer established that his property was assessed at 91.9 percent while similar properties were assessed between 40.2 percent and 57.2 percent of their market values). This Smith has done.

The assessed values in Midlake, as they exist today, evidence a widespread disparity in the assessed values of generally comparable properties which is pervasive, substantial, and arbitrary. If we were to allow the assessed value of Smith's property as determined by the board to stand, Smith would be required to pay property taxes more than 75 percent greater than almost half the properties in Midlake which are virtually identical to his. The gross inequity and disproportionality which would result is unsupportable from a constitutional perspective. See *Clifton,* 969 A.2d at 1213-14. (An "[i]ntentional systematic undervaluation by state officials of other taxable property in the same class contravenes the constitutional right of one taxed upon the full value of his property."); see also, *Goodman, Assessment Law & Procedure,* at 257 (quoted with approval in *Downingtown,* 590 Pa. at 474 n.16, 913 A.2d at 204 n.16) ("Failing to equalize on (new assessments) is an intentional violation of state law by the local assessing agency and is in direct violation of the United States Supreme Court holding in *Allegheny Pittsburgh Coal.*").

### (d) Remedy

Inherent in the requirement of uniformity is the principle that "a taxpayer should pay no more or no less than his proportionate share of the cost of government. Implementation of this principle [requires] that an owner's assessment be reduced so as to conform with the common-level [ratio] of assessment in the taxing district." *Deitch,* 417 Pa. at 220, 209 A.2d at 401.[11] From this, the school

---

11. As to what constitutes the common-level ratio, the Supreme Court, in *Deitch,* stated:

district argues that because Smith has confined his analysis of comparable properties to one development, rather than to representative properties throughout the county, he has failed to establish that his property has been assessed at a percentage of value greater than that applied generally throughout the taxing district and, therefore, is entitled to no relief beyond that required by 72 P.S. §5453.704(c). See *Baechtold v. Monroe County Board of Assessment Appeals,* 804 A.2d 713, 717-18 n.5 (Pa. Commw. 2002), *appeal denied,* 572 Pa. 726, 814 A.2d 678 (2002). Nonetheless, in *Brooks,* our Supreme Court stated that it is erroneous to conclude that an "assessment cannot be changed [or] reduced unless [the taxpayer] proves that a uniform ratio of assessed value to actual value has been applied generally throughout the entire district . . . ." 391 Pa. at 101, 137 A.2d at 276.

Where a taxpayer's property is assessed at a greater percentage than that of other similarly situated properties, the remedy is "to have the [taxpayer's] assessment reduced to the percentage of that value at which others are taxed even though this is a departure from the require-

---

"Where the evidence shows that the assessors have applied a fixed ratio of assessed to market value throughout the taxing district, then that ratio would constitute the common level. However, where the evidence indicates that no such ratio has been applied, and that ratios vary widely in the district, the average of such ratios may be considered the 'common level'. . . . Furthermore, it may be that the evidence will show some percentage of assessed to market value about which the bulk of individual assessments tend to cluster, in which event such percentage *might* be acceptable as the common level." *Deitch,* 417 Pa. at 220-21, 209 A.2d at 401. (footnote and citation omitted)

ment of statute. The conclusion is based on the principle that where it is impossible to secure both the standard of the true value, and the uniformity and equality required by law, the latter requirement is to be preferred as the just and ultimate purpose of the law." *Brooks,* 391 Pa. at 101, 137 A.2d at 276. Such result comports with the Supreme Court's recent admonition in *Downingtown,* that notwithstanding the Commonwealth's desire "to achieve overall uniformity by attempting to standardize treatment among differently situated property owners, its efforts in this regard do not shield it from the prevailing requirement that similarly situated taxpayers should not be deliberately treated differently by taxing authorities." 590 Pa. at 470, 913 A.2d at 201. (footnote omitted)

Once non-uniformity has been proven, the taxpayer is entitled to a reduction of his assessment to that proportionate with similar properties of the same nature unless "the evidence shows that [such comparables] are not representative of the district as a whole, [or] that the taxpayer has, in fact, not been assessed at more than the common-level [ratio] in the district." *Deitch,* 417 Pa. at 219, 209 A.2d at 401 (explaining the rationale behind *Appeal of Rick,* 402 Pa. 209, 167 A.2d 261 (1961) (holding that "a taxpayer is not entitled to have his assessment reduced to the lowest ratio of assessed value to market value to which he could point in the taxing district if such lowest ratio does not reflect the common assessment level which prevails in the district as a whole")); see also, *Green v. Schuylkill County Board of Assessment Appeals,* 565 Pa. 185, 195, 772 A.2d 419, 425-26 (2001) (explaining that once the presumptive validity of the assessment

created by the taxing authority's presentation of the assessment record into evidence has been rebutted by credible, relevant evidence introduced by the taxpayer, the taxing authority bears the risk of having the taxpayer's evidence accepted by the court if it fails to offer additional countervailing evidence). The alternative, as suggested by the school district, is to recognize that a core breakdown in the protection afforded by the Equal Protection Clause has occurred, yet provide no relief. This we will not do.

"To ensure proportionality, all property must be taxed uniformly, with the same ratio of assessed value to actual value applied throughout the taxing jurisdiction." *Clifton,* 969 A.2d at 1224. At what point the scale weighing the ratios of assessed to market values balances in favor of uniformity is never without controversy and will, more often than not, vary given the fluctuating nature of market values. To determine where that point lies in this case is better understood by a brief review of the assumptions underlying base year assessments.

Under the base year system of assessment, the initial assessment is determined by multiplying the base year market value by the county's predetermined ratio. Thereafter, uniformity is maintained—at least in theory—by requiring that for all administrative reassessments (*i.e.,* those initiated by the board), the board designates the new value in terms of base year dollars. See 72 P.S. §5453.102 (defining "base year" and stating that "[r]eal property values shall be equalized within the county and any changes by the board shall be expressed in terms of such base year values"). Consequently, a property's base

year assessment is not ordinarily changed with fluctuations in a property's market value attributable to market conditions alone but "remains static, fixed at its base year level until the next countywide reassessment." *Clifton,* 969 A.2d at 1203.

"This is so because a county utilizing a base year method of valuation typically does not consider market fluctuations subsequent to the base year when assessing 'current value,' or factor in variables such as improvements to a property that may increase its assessed value. If a building is constructed on a lot that was vacant during the base year, the property's assessed value is determined by using either sales of comparable properties in the base year or base year construction schedules." *Id.*

In contrast, the process of reviewing administrative assessments by appeal is premised on the assumption that where the current fair market values for a taxing district have appreciated and depreciated over time from their initial base year market values, the STEB's common-level ratio acts as a means of equalizing a property's actual ratio of assessed to current market value with the then prevailing ratio of assessed to market value in the district. Were no adjustments to be made, "[a] taxpayer could pay substantially more or less than his proportionate share of government by paying taxes based upon a predetermined ratio of a property's base year value where the current market value is, in fact, substantially less or greater than its base year value." *Armco,* 100 Pa. Commw. at 460, 515 A.2d at 330. Ultimately, the "inequities that inevitably result from the prolonged use of base year assessment values in a county where property values

have changed at divergent rates" require a countywide reassessment to withstand a constitutional challenge. *Clifton,* 969 A.2d at 1226, 1231.

As applies to Unit no. F201, the base year assessment for this property was $50,300. This figure remained unchanged through the time of Smith's purchase, with no triggering events occurring in the interim.[12] The sole reason for the board reassessing the property in 2007 was the school district's appeal, and the primary, if not the only, information upon which the board relied to change the actual value of the property from $100,600 (the base year valuation) to $275,000 was the purchase price paid by Smith in 2006.

At all times relevant to these proceedings, the county's estimated predetermined ratio has remained constant at 50 percent. In 2007, the STEB common-level ratio was 32.1 percent and in 2008, 31.3 percent. Because the common-level ratio exceeded the estimated predetermined ratio by more than 15 percent, the board was required by statute to apply the common-level ratio, which it did, setting the assessed value of the property at $88,141. This assessment, as discussed above, is unequal, excessive, and unjust, and we are not bound by it. *Downingtown,* 590 Pa. at 476, 913 A.2d at 205 (holding that

---

12. To justify a reassessment initiated by the board, one of three conditions must occur: (1) the property is divided and conveyed away in smaller parcels; (2) the county's economy or a portion of it has depreciated or appreciated to such an extent that real estate values are affected in that area; or (3) improvements to a property are made, removed, or destroyed. See 72 P.S. §5453.602a; see also, 72 P.S. §5347.1.

the constitutional requirement of tax uniformity prevails over the statutory scheme for tax equalization and that the legislature may not usurp the judiciary's function of interpreting the Pennsylvania Constitution).

Instead, we find the initial base year assessed value of the property to be a solid reference point upon which to base a uniformity determination. The uniformity of assessed values immediately following a countywide reassessment is not only presumptively valid but likely to be as close to countywide uniformity as is reasonably possible. In this respect, the assessment which existed at the time Smith purchased the property postdated the county's most recent countywide reassessment by five years, a relatively short period when reviewing the frequency of such assessments. See *Clifton,* 969 A.2d at 1225 n.39 (noting the correlation between a county's coefficient of dispersion and its most recent countywide reassessment).

Absent the school district's appeal, the assessment of this property would have remained at $50,300. The ratio of this assessed value to Smith's purchase price, 18.29 percent, is roughly equivalent to the assessment ratio of 18.11 percent which exists for the 42 comparable units at Midlake with assessed values of $49,300 to $50,300 when measured against the same purchase price. These assessments are clustered within a narrow range of one another and bear a consistent ratio of assessed to market values. In contrast, the 32 units which have been transferred since January 1, 2004, have a wide range of assessed values with divergent ratios of assessed to market values for like property. The assessment set by the board

intensifies this diversity while maintaining the assessment at $50,300 is consistent with the assumptions and premise of a base year valuation system. Given these considerations, to maintain equalization of the ratio of assessed value to current market value within the county requires that the property's assessment remain at $50,300.

## CONCLUSION

Fundamentally, it is unconscionable and unconstitutional to assess like or similar properties in the same neighborhood differently. When this occurs, it is the responsibility of the courts to determine where uniformity lies and which properties have been unfairly burdened. "[A]ny system which results in the intentional or systematic undervaluation of like or similar properties is impermissible." *Fosko,* 166 Pa. Commw. at 400, 646 A.2d at 1279.

Here, the board's reassessment of Smith's property on appeal has resulted in a substantial and unjustifiable disparity in the assessed value of Smith's property and that of other properties in Midlake having like characteristics and qualities.[13] While we accept and affirm the

---

13. The burden of correcting the inequity in assessed values which currently exists in Midlake cannot be passed to Smith by requiring him to challenge the assessments of his neighbors' property. See *Allegheny Pittsburgh Coal Co. v. County Comm'n of Webster County, West VA.,* 488 U.S. 336, 342-43 (1989). To the contrary, the county has an implicit duty, imposed by the Uniformity Clause, to impose assessments that are reasonable and proportionate, and the taxpayer has a right, guaranteed by that same provision, to pay taxes that are not excessively burdensome when compared with those imposed on other

board's determination that the fair market value of this property is $275,000, uniformity and equality in assessed value requires that the assessed value of the property remain at $50,300.

---

properties similarly situated. Correspondingly, "[i]t is the duty of the courts in dealing with this subject to enforce as nearly as may be equality of burden and uniformity of method in determining what share of the burden each taxable subject must bear." *Clifton v. Allegheny County,* 969 A.2d 1197, 1210 (2009).