MILLCREEK TOWNSHIP
SCHOOL DISTRICT

v.

COUNTY OF ERIE and Erie County
Board of Assessment Appeals.

Appeal of COUNTY OF ERIE, Appellant.

Commonwealth Court of Pennsylvania.

Argued Dec. 8, 1997.
Decided May 28, 1998.
As Amended May 28, 1998.
Reargument Denied July 17, 1998.

Thomas S. Talarico, Erie, for appellant.

Thomas P. Agresti and S.E. Riley, Erie, for appellee.

Before DOYLE and McGINLEY, JJ., and RODGERS, Senior Judge.

DOYLE, Judge.

The County of Erie and the Erie County Board of Assessment Appeals (Board),[1] appeal from an order of the Court of Common Pleas of Erie County, which granted the relief requested by the Millcreek Township School District (Millcreek) in the nature of mandamus ordering the Board to conduct a countywide reassessment of all properties by October 1, 2000.

## I. FACTUAL BACKGROUND

The relevant facts are as follows. The County of Erie and its Board of Assessment Appeals are responsible for establishing and maintaining the real property tax assessments in Erie County, including property located in Millcreek Township. Millcreek is a school district located within the County that levies taxes and sets millage on real estate located within its district for general

revenue purposes based upon the property assessments derived by the Board.

The last comprehensive countywide assessment of real property in Erie County was conducted by Allied Appraisal, Inc. between 1965 and 1968, which was subsequently implemented in 1969. Consequently, at present, all properties in Erie County are assessed by the Board by using 1969 as the base year. In ascertaining the base-year market value of properties, the County Assessment Office has, for the last 28 years, utilized the same Pricing Manual originally prepared by Allied Appraisal, Inc., the same "base year" calculation, and the same grading procedures that were established by Allied Appraisal Inc. when it conducted the County's last countywide assessment back in 1968. The present modality is that, first, an on-site inspection of the property is conducted, after which the base value of the property is determined by taking into account measurements, improvements and other factors that would affect the value of the property as provided for in the Pricing Manual. An assessor for the County then assigns a "grade" to the property in accordance with a grading schedule contained in the Pricing Manual.[2] For the last 28 years, the County has used the same Pricing Manual, the same "base year" calculation, and the same grading procedures that were established by Allied Appraisal Inc. in 1968 for the 1969 base year.

After the base year market value of the property has been ascertained, the Board determines the property's assessment value by applying a predetermined ratio of 40 percent to the property's 1969 market value. The predetermined ratio, which may not exceed 100% of actual value, is derived by County pursuant to Section 402(a.1) of the General County Assessment Law[3] and reflects the ratio that the County determines

1. The County and Board will hereafter be referred to collectively as "the County."

2. The County's brief describes the "grade" of a property and the grading schedule as follows:
 The "grading" schedule found in the Pricing Manual defines "grade" as the qualitative relationship between the property being reviewed by the assessor and the average or "C" grade home.... According to the assessors, "grade"

is the assessor's or appraiser's interpretation of the quality of construction of and materials used in constructing the property as well as the assessor's consideration of the "grades" of comparable properties within the same or nearby neighborhood.
(County's Brief at 6–7.) (Citations omitted.)

3. Act of May 22, 1933, P.L. 853, *as amended*, 72 P.S. § 5020–402(a.1).

should exist between a property's assessed value and its fair market value.

In 1995, the common level ratio for Erie County was 9.4 percent. The common level ratio is a statutorily created statistical calculation performed by the State Tax Equalization Board (STEB) to determine an average ratio of assessed value to current market value of real property within a particular county and is based upon data gathered from transfers of real property occurring during the prior calendar year. The common level ratio is also sometimes referred to as the STEB ratio. By way of illustration, a common level or STEB ratio of 9.4 percent means that, on average, properties in Erie County are presently being assessed at 9.4 percent of their actual or market value, as opposed to the predetermined ratio of 40 percent of the base-year market value of the properties. This situation typically occurs where a reassessment has not been performed by the County for some time, in which case the assessed value of the property remains the same, while, at the same time, the market price of the property rises, thereby reducing the comparative ratio between the assessed value and actual current market value of the property.

The overall STEB-based coefficient of dispersion (COD) in Erie County for 1995 was 30 percent. The COD is a statistical tool that is widely regarded as the primary statistical indicator of inequity in tax assessments and represents the average percentage of deviation between the county's common level or STEB ratio and the ratio of the assessment to the current market value of individual properties within the county. Succinctly put, it is the average error in the assess-ments. For instance, a COD of 30% would indicate that, on average, there exists a 30% deviation between the county's common level or STEB ratio and the actual ratio of assessed to current market values of properties.[4]

On October 9, 1995, Millcreek commenced the instant action in mandamus against the Board and County seeking an order to compel the County to undertake a comprehensive countywide reassessment of all real property within its jurisdiction. Millcreek alleged that the last countywide reassessment had not been performed since 1969, while major factors such as inflation, population shifts, development and deterioration of properties and changed use of properties continued to impact the assessed values of properties, that the assessment methodology employed by the Board and County was outdated, that the assessment practice and conduct of the Board and County was arbitrary, and that a statistical analysis of the assessments demonstrated a violation of the uniformity clause mandated by Article VIII, Section 1 of the Pennsylvania Constitution. On October 23, 1996, Millcreek filed an amended complaint in which it further alleged that the County engaged in selective reassessment by increasing the land valuations along the bayfront and in the City of Erie.

Following discovery, a bench trial was held before the Court of Common Pleas in early 1997, and closing arguments were heard on February 4, 1997. After conducting a detailed analysis of the voluminous record and extensive statistical data involved in this case, including the CODs in 22 other counties of this Commonwealth prior to countywide

4. To further illustrate the significance of the COD, the International Association of Assessing Officers' manual, entitled *Standard on Ratio Studies,* describes the COD as follows:

The most generally useful measure of variability is the coefficient of dispersion (COD). It measures the average percentage deviation of the ratios from the median ratio and is calculated by (1) subtracting the median from each ratio, (2) taking the absolute value of the calculated differences, (3) summing the absolute differences, (4) dividing by the number of ratios to obtain the "average absolute deviation," (5) dividing by the median, and (6) multiplying by 100....

(R.R. at 947a.)

By way of a more simplistic explanation of the significance of the COD, consider the following illustrative example. Suppose that the common level ratio or STEB ratio for a given county, or for a type of property within a county, is 10% and that the actual ratio of assessed to market values of three properties are as follows: 5% (50% less than the STEB ratio); 10% (equivalent to the STEB ratio); and 15% (50% greater than the STEB ratio). The approximate COD for this sampling of properties would be 33% (50% + 0% + 50% = 100% ÷ 3 = 33.3%). (Notes of Testimony (N.T.), 1/9/97, at 63–66; Reproduced Record (R.R.) at 483a–486a.)

reassessments in those counties, the Court of Common Pleas entered an opinion and order granting the relief requested by Millcreek, and ordered the County to undertake a countywide reassessment of all properties by October 1, 2000. In its opinion, the trial court rendered the following relevant findings of fact and conclusions of law:

10. The Common Level Ratios for 1993, 1994 and 1995 as determined by the State Tax Equalization Board in each of those years and certified to the Chief Assessor of Erie County in each of those years was 9.9 in 1993, 9.7 in 1994 and 9.4 in 1995....

11. Since 1969 major factors such as inflation, population shifts, widespread development and deterioration of properties, and changed use of significant numbers of commercial and industrial properties, have continued to impact upon the assessed values of real properties in the County and specifically within the confines of Millcreek Township.

12. The time has come for revaluation of all property within Erie County to bring its system up to date and to clear up inequities for the owners of those properties who are having their tax burden subsidized by owners of other properties....

13. Testimony and documentary evidence offered by Millcreek Township School District shows that the assessment practice utilized by the Erie County Assessment Office over the past twenty-six (26) years has reached a point where it has a discriminatory effect....

14. Assessments have not been received on a county-wide basis for over twenty-six (26) years and the valuations placed on the various properties throughout the County have become so disparate that a county-wide revision of assessments is necessary....

. . . .

18. The Board of Assessment Appeals has an absolute duty under the United States and Pennsylvania Constitutions and the laws of the Commonwealth of Pennsylvania to maintain accuracy, uniformity and equality in property tax assessments and this duty is owed to all residents, property owners, taxpayers and/or taxing bodies within Erie County.

. . . .

35. The overall STEB-based coefficient of dispersion in Erie County in 1995 was [30%]. By class, the STEB-based level of assessment for residential [property] in Erie County in 1995 was 10.03%, and the COD was 28.3%; for lots less than ten (10) acres, the level of assessment was 14.3% and the COD was 41%; for agricultural property, the level of assessment was 8% and the COD was 30%, and for land more than ten (10) acres, the level of assessment was 3.95% and the COD was 47%.

. . . .

60. The mere passage of time, by itself, normal maintenance or disparities in assessed to fair market values will not trigger an assessment[,] for the law does not specify a time period within which a parcel by parcel county-wide reassessment must be accomplished.

61. A taxpayer challenging the administration of the tax law bears a heavy burden but in this case, the taxpayer has met that burden.

62. The current system of assessing properties in Erie County violates the Pennsylvania and state uniformity clauses concerning taxation....

63. Assessments in Erie County are sufficiently disparate and far outside of accepted tolerances for uniformity so as to require certain owners to pay a disproportionately greater share of local taxes than they would otherwise be called upon to pay [were] the assessments appropriately equal....

64. Plaintiff, Millcreek Township School District, is without any other full and adequate remedy at law and therefore is entitled to the relief requested in its action in Mandamus compelling the Defendants to immediately undertake countywide real estate property tax reassessment....

65. The tax system in place in Erie County is inequitable and lacks uniformity, and therefore, is illegal....

(Trial Court Opinion at 14–16, 19, 25–26.) (Citations omitted.)

Although the Court of Common Pleas relied in part upon the STEB data, common level ratio, and COD, in ultimately concluding that reassessment should be ordered in Erie County, Judge George Levin also reasoned as follows:

> First, the last reassessment took place in 1968 and was implemented in 1969, twenty-eight years ago. Since that time there have been dynamic changes in the real estate market as well as major shifts in land development. Granted, there is no statutorily created time limit which mandates reassessment; however, one must use common sense to see if these significant changes as demonstrated in part by [Millcreek's] Exhibits 39 and 39–A through 39–D, as well as [the County's] Exhibits B–1 through B–11, and other evidence proffered by Millcreek at various hearings, have affected the uniform taxation of the residents of Erie County. Again, the length of time since the last assessment may not, by itself, justify an order for reassessment but it must be considered as a factor along with all other evidence in the case to determine whether court-ordered reassessment is justified.
>
> Other factors that would dictate the necessity of court-ordered reassessment, when considered with all other evidence, are as follows: 1) the Board's employees have been working with insufficient and outdated instructions and guidelines; 2) the guidelines did not contain adequate standards for the grading of properties; 3) the lack of uniformity in the assessments of mobile homes in Erie County; and 4) the inadequacy of the bayfront assessment as well as the various changes made in that assessment.

All of this makes the Board's procedures on setting assessments suspect. While any one of the above infirmities alone might not have been sufficient to order reassessment, when considered as a whole and in their totality, it is evident that Millcreek's plea for county-wide reassessment is justified and merited. If the Court did otherwise, it would not be carrying out its judicial obligation and as such would be subject to severe criticism by all parties. The dusty and antiquated assessment records call out from their resting place in the archives of the Erie County Courthouse and demand that the Court take this necessary action. Ordering this, even though it may be unpopular with some of the citizenry of Erie, is the only method by which appropriate relief can be granted.

> . . . .
>
> . . . . In view of all of the evidence offered, the Court must find that a substantial number of Millcreek taxpayers are carrying an excessive tax burden in violation of the Equal Protection Clause. They are receiving discriminatory treatment in that they are being subjected to taxes not imposed upon others in the same class. This Court cannot countenance such an injustice. Therefore, based upon the foregoing reasons, Millcreek's petition for writ of mandamus is hereby granted and the County is ordered to perform a county-wide reassessment.

(Trial Court Opinion at 6–8.) (Footnote omitted.) (Emphasis deleted.)[5] The County's appeal to this Court ensued.[6]

On appeal, the County argues: (1) that the Court of Common Pleas lacked subject matter jurisdiction over the matter pursuant to the Separation of Powers Doctrine; (2) that

(Trial Court Opinion at 8–9.)

---

**5.** In his opinion, Judge Levin also made the following astute observation:

> This Court notes that there is no greater challenge to government than to devise a system of taxation which insures equality and uniformity. The ultimate goal of the Board should be to conceive a plan where absolutely no one is forced to shoulder any expense, not even one dollar, in excess of his or her fair share. Likewise, no one shall pay even one dollar less than is equitable.

**6.** There is an additional and interesting facet in this case which is worthy of note. On the second day of the trial, the Board of Assessment Appeals, which was originally named as a defendant in this case, filed an amended answer in which it *admitted* that the assessments in Erie County "are outdated, inequitable, inaccurate and non-uniform."

the County did not engage in tax assessment conduct which violated the law or the uniformity requirement of the Pennsylvania Constitution; and (3) that Millcreek failed to introduce sufficient, competent statistical evidence demonstrating that the assessments of real property in the County lacked uniformity.

## II. STATUTORY AND CONSTITUTIONAL FRAMEWORK

There are two statutory schemes applicable to the assessment of real property in Erie County: the General County Assessment Law,[7] and the Second Class A and Third Class County Assessment Law.[8] The general power to assess real property is grounded in Section 8 of the General County Assessment Law, which pertinently provides as follows:

a) It shall be the duty of the several elected and appointed assessors, . . . to rate and value all objects of taxation, whether for county, city, township, town, school, institution district, poor [district] or borough purposes, according to the actual value thereof, and at such rates and prices for which the same would separately bona fide sell. In arriving at actual value the county may utilize either the current market value or it may adopt a base year market value. In arriving ·at such value the price at which any property may actually have been sold either in the base year or in the current taxable year, shall be considered but shall not be controlling. Instead, such selling price, estimated or actual, shall be subject to revision by increase or decrease **to accomplish equalization with other similar property within the taxing district.** In arriving at the actual value, all three methods, namely, cost (reproduction or replacement, as applicable, less depreciation and all forms of obsolescence), comparable sales and income approaches, must be considered in conjunction with one another. Except in counties of the first class, no political subdivision shall levy real estate taxes on a county-wide revised assessment of real property until it has been completed for the entire county.

(a.1) The board of county commissioners shall establish and determine, after proper notice has been given, an established predetermined ratio of assessed value to actual value which may not exceed one hundred per centum (100%) of actual value. The commissioners, acting as a board of revision of taxes, or board for the assessment and revision of taxes shall apply the established predetermined ratio to the actual value of all real property to formulate the assessment roll.

(b) Except as to counties of the first and second class, after any county makes a county-wide revision of assessment of real property · at values based upon an established predetermined ratio as required by law or after any county changes its established predetermined ratio, each political subdivision, which hereafter for the first time levies its real estate taxes on that revised assessment or valuation, shall, for the first year, reduce its tax rate, if necessary, for the purpose of having the total amount of taxes levied for that year against the real properties contained in the duplicate for the preceding year, equal, in the case of any taxing district, not more than ten per centum greater than the total amount it levied on such properties the preceding year, notwithstanding the increased valuations of such properties under the revised assessment. . . .

72 P.S. § 5020–402 (emphasis added). Furthermore, Section .6 of the Second Class A and Third Class County Assessment Law provides in pertinent part as follows:

(c) The board shall assess real property at a value based upon an established predetermined ratio which may not exceed one hundred percent of actual value. Such ratio shall be established and determined by the board of county commissioners after proper notice has been given. In arriving at actual value the county may utilize

---

7. Act of May 22, 1933, P.L. 853, *as amended*, 72 P.S. §§ 5020–101 to 5020–602.

8. Act of June 26, 1931, P.L. 1379, *as amended*, 72 P.S. §§ 5342–5350k.

the current market value or it may adopt a base year market value.

(d) In arriving at actual value, the price at which any property may actually have been sold, either in the base year or in the current taxable year, shall be considered but shall not be controlling. Instead such selling price, estimated or actual, shall be subject to revision by increase or decrease **to accomplish equalization with other similar property within the taxing district.** In arriving at the actual value, all three methods, namely, cost (reproduction or replacement, as applicable, less depreciation and all forms of obsolescence), comparable sales and income approaches, must be considered in conjunction with one another.

(e) The board shall apply the established predetermined ratio to the actual value of all real property to formulate the assessment roll.

72 P.S. § 5348 (emphasis added).

Moreover, the significance of the common level or STEB ratio is reflected in Section 8 of the Second Class A and Third Class County Assessment Law, which applies to individual appeals to the Board:

(d.1) In any appeal of an assessment the board shall make the following determinations:

(1) The market value as of the date such appeal was filed before the board.

(2) The common level ratio published by the State Tax Equalization Board on or before July 1 of the year prior to the tax year on appeal before the board.

(d.2) The board, after determining the market value of the property, shall then apply the established predetermined ratio to such value **unless the common level ratio published by the State Tax Equalization Board on or before July 1 of the year prior to the tax year on appeal before the board varies by more than fifteen percent from the established predetermined ratio, in which case the board shall apply that same common level ratio to the market value of the property.**

72 P.S. § 5349 (emphasis added).

 It is well settled that, when real estate is used as a basis for taxation, a county, in exercising its power under the provisions of the General County Assessment Law and Second Class A and Third Class County Assessment Law, must derive and apply tax assessments in a uniform and equal fashion. *In re Summit House Real Property Assessment Appeals,* 22 Pa.Cmwlth. 462, 349 A.2d 505 (1975). This principle is based upon Article VIII, Section 1 of the Pennsylvania Constitution, known as the Uniformity Clause, which provides that:

All taxes shall be uniform, upon the same class of subjects, within the territorial limits of the authority levying the tax, and shall be levied and collected under general laws.

The test for determining uniformity under this provision of the Pennsylvania Constitution is whether there exists a reasonable distinction and difference between classes of taxpayers sufficient to justify different taxation. *F.J. Busse Co. v. Pittsburgh,* 443 Pa. 349, 279 A.2d 14 (1971).

In this regard, the equality of taxation within the Commonwealth implicates federal constitutional principles—namely, the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. The Equal Protection Clause commands that "No State shall ... deny to any person within its jurisdiction the equal protection of the laws," which is essentially a direction that all persons similarly situated should be treated alike. *City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). The United States Supreme Court has specifically addressed the relationship between the Equal Protection Clause and the nonuniformity of state-imposed taxes in *Allegheny Pittsburgh Coal Co. v. County Commission of Webster County,* 488 U.S. 336, 109 S.Ct. 633, 102 L.Ed.2d 688 (1989):

"[I]ntentional systematic undervaluation by state officials of other taxable property in the same class contravenes the constitutional right of one taxed upon the full value

of his property." ... "The equal protection clause ... protects the individual from state action which selects him out for discriminatory treatment by subjecting him to taxes not imposed on others of the same class." ... Viewed in isolation, the assessments for petitioners' property may fully comply with West Virginia law. But the fairness of one's allocable share of the total property tax burden can only be meaningfully evaluated by comparison with the share of others similarly situated relative to their property holdings. The relative undervaluation of comparable property in *Webster County* over time therefore denies petitioners the equal protection of the law.

*Id.* at 345–46, 109 S.Ct. 633 (citations omitted) (second alteration in original).

It is with these principles in mind that we consider the present tax assessment scheme in Erie County.

### III. ANALYSIS

#### A. *Subject Matter Jurisdiction*

The county first argues that the issue of whether or not to conduct a countywide reassessment is a nonjusticiable political question that is to be determined solely by County Council, which is designated as the legislative branch of government in Erie County under the County's Home Rule Charter.[9] The County further argues in this regard that, because the decision of whether to conduct a countywide reassessment is a nonjusticiable political question to be determined by the legislative branch, an order by the judicial branch mandating such reassessment impinges upon the Separation of Powers Doctrine.[10]

In support of this argument, the County cites the landmark decision of the United States Supreme Court in *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962),

and directs our attention to the oft-quoted language from that opinion in which the Court outlined the salient characteristics of a nonjusticiable political question:

> a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government....

369 U.S. at 217, 82 S.Ct. 691. Relying upon this language as the basis for its position, the County argues as follows:

> The Home Rule Charter has constitutionally committed the time and funding for a countywide reassessment to a policy determining body of the County of Erie, namely, County Council. It is impossible for this Court to decide whether to conduct a countywide reassessment "without an initial policy determination of a kind clearly for non-judicial discretion." ... Thus, the Court may not order a countywide reassessment without expressing a lack of respect due to the coordinate branches of government, as the revision of assessments have been exclusively committed to the Defendant for self-monitoring while the determination to fund a countywide reassessment has been exclusively committed to County Council under the Home Rule Charter.

(County's Brief at 29.) (Quoting *Baker v. Carr.*) (Citation omitted.) [11]

■ The political question doctrine is derived from the separation of powers mandated by our tripartite system of federal constitutional government, *Powell v. McCormack*, 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969), and has been applied to this Common-

---

**9.** *See* 325 Pa.Code §§ 1–2.1, 1–2.3, 1–6.1.

**10.** This argument was initially presented to the Court of Common Pleas in its preliminary objections, which that Court dismissed after finding no merit to the argument.

**11.** We first note that a Home Rule Charter is not a constitution and therefore certainly does not "constitutionally" commit anything to County Council. The county governments in this Commonwealth clearly are not sovereign in their own right and derive their authority only by the grace of the sovereign Commonwealth.

wealth as well. *Sweeney v. Tucker*, 473 Pa. 493, 375 A.2d 698 (1977). In *Blackwell v. City of Philadelphia*, 546 Pa. 358, 684 A.2d 1068 (1996), the Pennsylvania Supreme Court further described this doctrine as follows:

A nonjusticiable political question is presented where there is a challenge to legislative power which the Constitution commits exclusively to the legislature.... Courts will not review actions of another branch of government where political questions are involved because the determination of whether the action taken is within the power granted by the constitution has been entrusted exclusively and finally to political branches of government for self-monitoring. *Id.* at 509, 375 A.2d at 706. In deciding whether a dispute concerns a non-justiciable political question, this Court in [*Sweeney v. Tucker*, 473 Pa. 493, 375 A.2d 698 (1977),] adopted the standards enunciated in *Baker v. Carr*, [369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663] (1962).... [12]

Determination of whether a complaint involves a non-justiciable political question requires making an inquiry into the precise facts and posture of that complaint, since such a determination cannot be made merely by semantic cataloguing....

Under the political question doctrine, courts generally refuse to scrutinize a legislature's choice of, or compliance with, internal rules and procedures. **If defendants did not violate any constitutional or statutory provision**, the question of whether the legislature violated its own internal rules is generally non-justiciable since the courts cannot interfere with the internal workings of the legislature "without expressing the lack of respect due coordinate branches of government." ...

*Blackwell,* 546 Pa. at 365, 684 A.2d at 1071 (emphasis added) (citations omitted).

■ However, although the County argues that reassessment involves a nonjusticiable political determination to be made exclusively by County Council, the constitutionality and equality of assessments is clearly within the province of the judicial branch of government. As this Court stated in *Jubelirer v. Singel,* 162 Pa.Cmwlth. 55, 638 A.2d 352 (1994),

.... Article II, [S]ection 11 gives the Senate the power to determine its own proceedings. However, our conclusion that these matters are constitutionally committed to the Legislature by Article II of the Pennsylvania Constitution does not end our inquiry.

A determination that an issue is a nonjusticiable political question is essentially a matter of judicial abstention or restraint. As our Supreme Court has said: "To preserve the delicate balance critical to a proper functioning of a tripartite system of government, this Court has exercised restraint to avoid an intrusion upon the prerogatives of a sister branch of government.... Whatever theory is employed, the legitimacy of the abstention is dependent upon the situation presented." ...

**Here, Petitioners allege various constitutional violations. In such cases, we will not abdicate our responsibility to "insure that government functions within the bounds of constitutional prescrip-**

. **12.** The full text of the Supreme Court's opinion in *Baker v. Carr* that is ordinarily cited for this proposition is as follows:

It is apparent that several formulations which vary slightly according to the settings in which the questions arise may describe a political question, although each has one or more elements which identify it as essentially a function of the separation of powers. Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determina-

tion of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker v. Carr,* 369 U.S. at 217, 82 S.Ct. 691. The Pennsylvania Supreme Court has held that the presence of any one of these elements will prompt a court to refrain from considering the claim asserted. *See Zemprelli v. Daniels,* 496 Pa. 247, 436 A.2d 1165 (1981).

tion ... under the guise of deference to a co-equal branch of government.... It would be a serious dereliction on our part to deliberately ignore a clear constitutional violation." ... As the Supreme Court stated in *Baker v. Carr:*

> Deciding whether a matter has in any measure been committed by the constitution to another branch of government, or whether the action of that branch exceeds whatever authority has been committed, is itself a delicate exercise in constitutional interpretation, and is a responsibility of this Court as the ultimate interpreter of the Constitution....

*Jubelirer,* 638 A.2d at 358 (citations omitted). Thus, it is clear that where a constitutional violation has been alleged, a court may not abdicate its responsibility to uphold the Constitution by using the Separation of Powers Doctrine, or the nonjusticiable political-question doctrine, as a basis for such an abstention.

■ In this case, Millcreek has alleged that the County's failure to conduct a countywide reassessment since 1969 has given rise to inequities of constitutional proportions, and we must therefore reject the County's argument that the judicial branch of government lacks the authority to order such reassessment because it is a nonjusticiable political question pursuant to the Separation of Powers Doctrine.[13] We also note in this regard that, when the failure of a government official or entity to perform a ministerial duty reaches unconstitutional proportions, as is alleged by Millcreek in this case, a mandamus action is, by its very nature, the appropriate means by which to compel the government official or entity to perform that act in conformance with the Constitution, *see City of Lancaster v. Lancaster County,* 143 Pa.Cmwlth. 476, 599 A.2d 289 (1991), *petition for allowance of appeal denied,* 530 Pa. 634, 606 A.2d 903 (1992), regardless of whether that duty may ordinarily be in the nature of a nonjusticiable political question.

13. We note that the division of powers which the County claims is upset by ordering it to conduct a countywide reassessment is preserved by the

### B. Constitutionality of Tax Assessments in Erie County and Substantial Statistical Evidence

The County next argues that "Erie County did not engage in tax assessment conduct which violated the law of the uniformity requirement of the Constitution of the Commonwealth of Pennsylvania." (County's Brief at 29.) The County further argues in this regard that Millcreek "failed to introduce sufficient, competent statistical evidence to prove the assessments of real property in Erie County lacked uniformity." (County's Brief at 38.)

The trial court rendered the following relevant findings of fact on this issue:

66. The valuation of mobile homes on a square footage only basis is improper in that it does not consider new market values and considerations of the real world with respect to value.

67. The Board did not give adequate instructions, guidelines or reasonably objective standards for the grading of properties.

78. The tax assessment procedures used by the Erie County Assessment Office since the last reassessment in 1969 including, but not limited to, lack of written procedures for assessing condominium units and the land upon which they are situated, replacement of transportation systems, grading of properties without any written guidelines, criteria, procedures or policy, assigning grades to property based upon locational differences when the properties are substantially similar or identical in quality or construction, workmanship and materials used, use of "temporary values" with regard to residential, new construction, etc., cumulatively have resulted, when considered with the disparity of the coefficient of dispersion values as well as the fact that there has been no assessment for approximately 28 years coupled with dynamic changes in market values, in lack of uniformity, inequity and a discriminatory effect on the owners of real estate in the

heavy burden of proof that a taxpayer must carry in order to prevail under such circumstances.

county of Erie to such an extent as to require county-wide reassessment. . . .

(Trial Court Opinion at 26, 28.) (Citation omitted.)

The trial court relied in part upon the decision of this Court in *City of Lancaster v. Lancaster County,* in which a group of Lancaster County municipalities and individual taxpayers appealed from an order of the Lancaster County Court of Common Pleas which denied the municipalities' and taxpayers' challenge to Lancaster County's method of determining real property assessments. The basis for this challenge was Article VIII, Section 1 of the Pennsylvania Constitution, as well as Section 7(d) of the Third Class County Assessment Law, 72 P.S. § 5348(d). When this Court decided *City of Lancaster,* the last countywide reassessment in Lancaster County had been conducted in 1960 and became effective on January 1, 1962. Thereafter, the County used 1960 as its base year and determined a property's assessed value by applying a predetermined ratio of 100% of the property's base year market value. The evidence adduced during the nonjury trial before the Lancaster County Court of Common Pleas indicated that the CODs for the county were as follows: 26.4% in 1985, 26.9 % in 1986, 24.8% in 1987, and 17.8 % in 1988. The trial court issued an adjudication and order that denied all counts of the amended complaint filed by the municipalities and individual taxpayers.

■ We ultimately reversed the trial court, thereby remanding the case to the trial court for a countywide reassessment of property values for tax assessment purposes, and concluded that "where, as here, there has not been an assessment of the entire County since 1960, there can be no uniformity of assessment" and that "the County's taxing scheme is constitutionally infirm." *Id.* 599 A.2d at 300–01. In so holding, we indicated that the trial court erred in concluding that a COD of 20% was acceptable or tolerable:

Common Pleas appeared to give considerable weight to the Coefficient of Dispersion (COD) as an indicator of whether the constitutional requirement of uniformity was satisfied and as a factor in determining whether a county-wide reassessment was necessary. . . . [Common Pleas] found that "[a] COD of twenty percent is recognized as being good or tolerable[.]" . . .

Appellants maintain that there was no evidence produced to show that a COD of 20% was considered acceptable by the assessment industry for all types of property within a county. In support of its finding, Common Pleas cited to . . . a publication by the Research and Technical Services Department, International Association of Assessing Officers (IAAO) entitled Evaluating Real Property Assessment Practices, a Management Guide. Therein, it states:

Coefficients of dispersion can and should be computed for various classes, neighborhoods, and other selected property groups. When they are calculated for single-family residential properties, a high or commendable degree of assessment uniformity is indicated by CODs in the range of 5.0–15.0, depending on the nature of properties. In areas containing newer and relatively similar homes, CODs at the lower end of the range are obtainable. In areas containing older and relatively dissimilar homes, CODs at the upper end of the range typically indicate good performance. . . .

. . . . We are in agreement with appellants that there is not substantial competent evidence of record to support Common Pleas' finding regarding the acceptable COD and that such finding was in error. In accordance with the text quoted above, assuming the acceptable maximum is fifteen percent for all but infrequently sold properties, then the evidence produced by the County shows that it has not been able to obtain that maximum.

It is apparent to this Court that the overwhelming evidence in this matter indicates that, as a matter of law, the County's taxing scheme is outdated and replete with inequities. . . .

*Id.* at 296–97 (citation omitted) (footnote omitted) (second alteration in original). Thus, the clear import of our decision in *City of Lancaster* is that, where the record indicates that the COD is unacceptably high, and where a County's tax assessment scheme is

outdated and results in demonstrable inequities in assessments, countywide reassessment may be ordered by the trial court.

█ In this case, the voluminous record more than adequately demonstrates that Erie County's current system of assessing properties resulted in unconstitutional disparities in assessments among the property owners, and that the resulting inequities were so pervasive and problematic that an order for countywide reassessment was the only constitutionally appropriate remedy under the circumstances.

Specifically, Millcreek presented the testimony of Mr. Edgar E. Hayes, an expert in the field of assessments, who testified at length as to the inadequacies of the assessment and grading procedures employed by the County's assessors, the County's lack of adequate instructions for conducting assessments, the problems associated with using 1969 as the base year, the adverse effects of dynamic changes in the real estate market and land development within Erie County upon the County's assessment scheme, as well as the unacceptably high CODs resulting from each of these factors. He ultimately rendered the following professional opinion on the issue of whether Erie County is in need of a comprehensive countywide reassessment plan:

Q: Mr. Hayes, based upon the data that you've reviewed, the information that we've given you regarding the length of time since the last reassessment in Erie County, the statistical analysis that you undertook, the information we provided you and you reviewed regarding the failure to adhere to base year assessment procedures, including perhaps especially the grading procedures without a definition, have you reached an opinion to a reasonable degree of professional certainty as to whether reassessment is required or should be undertaken in Erie County as of the present time?

A: Yes.

Q: What is that opinion?

A: The opinion is that the degree of inequities, the passage of time, and the need to implement better defined and documented and responsive base year proce-

dures suggests that it's inescapable that the only way you can address the circumstance is to conduct a complete countywide reassessment.

Q: Is there any degree of equivocation on your part in providing that opinion?

A: Absolutely none.

(Notes of Testimony (N.T.), 1/9/97, at 145–46; Reproduced Record (R.R.) 565a–66a.) The record also contains a number of reports prepared by Mr. Hayes, in which he concluded as follows:

- The lack of written documentation and procedural guidelines, concerning subjective determinations (such as grade, cost and design adjustments) contributes to the lack of assessment uniformity. Lack of definition and documentation can only contribute to actions verging on ad hoc.

- There appears to be significant contradiction among [County] assessors as to how assessment procedures are applied. Notwithstanding it may be the assessors' intent to be uniform (demonstrated by their relatively consistent claim that this is an important goal), it is virtually impossible to remain uniform to 1969 procedures if different assessors employ different considerations in the establishment of assessments.

- Base year procedures can be defined as the entire specific set of appraisal procedures which existed and were employed during the last reassessment. It is my opinion that base year procedures have not been uniformly executed over time. Testimony provides indications that different considerations and procedures have been employed. It is my opinion that such improper practices are probably the product of misunderstood concepts rather than bad faith efforts on the part of the assessors.

- The assessors lack understanding and/or insight to the meaning, significance and potential value of the CLR (common level ratio) statistic. It is important to reflect on what the CLR is. The CLR is a statistic that expresses the *countywide average* relationship of

*current* assessments to *current* market value. The claim that current assessment[s] actually represent 1969 assessments is very unlikely, in light of the fact that many assessments have been changed (perhaps as many as half) by many different people—at hundreds of different points in time, over the course of 25 years.

- The assessors seem to believe that the CLR has; a) applicability as a conversion device which can covert a current value back into a 1969 value indication and b) that in some way shape or form is relevant to specific, individual properties. There is little, if any, evidence that either conclusion on the part of the assessors is true.

- The assessors purport to be able to correct 1969 valuation errors. They suggest that they are able to do this without specific utilization of 1969 market value indications (sales prices) from the 60s or 70s. This is preposterous.

- If the basic issue is "whether or not assessments are being maintained uniformly in Erie County" there are two categories of evidence. First is the objective statistical evidence previously submitted. The statistical evidence clearly indicates accuracy and uniformity of values is poor and standards have not been met. The second category is the testimony and evidence concerning procedural practices, *i.e.*, broadly the base year system employed by the assessors. The testimony is replete with significant evidence that uniformity of procedure is lacking. In instances, the definitions, guidelines, and procedures are inadequate. In other instances the inadequacies are due to the assessors' inability to execute either the procedure or even the intent of the procedure properly. The result of either case in nonuniformity of procedure, which in virtually all cases translates into violations of the base year system.

In the final analysis, either of the two categories of evidence (statistical or procedural inadequacies), is conclusive of the need for reassessment. The assessors' in-

ability to uniformly apply base year procedures is, to a large extent, rooted in the lengthy time frame since the base year procedures were created and implemented. This is a circumstance that can only be addressed via reassessment. To believe otherwise suggests that it is possible to maintain accurate and uniform assessments for a virtually unlimited time period without performing reassessment. This position is patently absurd and is rejected by all knowledgeable industry participants.

(Report of Edgar E. Hayes, 10/14/96, at 5–6; R.R. at 984a–985a.)

Millcreek also introduced the *Standard of Ratio Studies* manual published by the International Association of Assessing Officers (IAAO), which was cited by Mr. Hayes as the authoritative resource on the issue of acceptable CODs. The manual indicates as follows with respect to the maximum acceptable COD levels:

**13.2.2 Uniformity among Single–Family Residential Properties.** The COD for single family homes and condominiums should be 15.0 or less. In areas of newer or fairly similar residences, it should be 10.0 or less.

**13.2.3 Uniformity among Income–Producing Properties.** The COD should be 20.0 or less. In larger, urban jurisdictions, it should be 15.0 or less.

**13.2.4 Uniformity among Vacant Properties.** The COD for vacant land should be 20.0 or less.

(*Standard on Ratio Studies*, IAAO, at 24; R.R. at 953a.) Additionally, the overall CODs in Erie County in recent years, which were stipulated by the parties, were as follows:

| YEAR | COD |
|------|-----|
| 1987 | 27.7 |
| 1988 | 27.7 |
| 1989 | 26.9 |
| 1990 | 27.4 |
| 1991 | 27 |
| 1992 | 27 |
| 1993 | 27 |
| 1994 | 30 |
| 1995 | 30 |

(Stipulation of Facts, 12/4/96, at 4; R.R. at 30a.) This evidence indicates that the COD

for Erie County has been unacceptably high for many years and that it has increased significantly in recent years. Millcreek also presented evidence demonstrating the CODs for the years 1993, 1994 and 1995 for the different classifications of property:

| Classification of Property | 1993 COD | 1994 COD | 1995 COD |
|---|---|---|---|
| Countywide Average | 27 | 30 | 30 |
| Residential | 26 | 28.2 | 28.3 |
| Sales of lots less than 10 acres | 52.4 | 72.6 | 58.1 |
| Commercial Sales | 35.7 | 45.4 | 41.8 |
| Agricultural Sales | 30.5 | 43.6 | 30.7 |
| Vacant Lots over 10 Acres | 44.6 | 62.2 | 42.3 |

When the CODs for these properties are compared to the standards set forth in the IAAO manual on *Standards on Ratio Studies,* it is clear that these COD levels are well beyond the maximum CODs regarded as acceptable by the industry.[14]

■ Although the IAAO standards are not necessarily dispositive of this issue, we note that this evidence, along with the expert testimony of Mr. Hayes regarding the inadequacies of the grading procedures of the County's assessors and the lack of uniform instructions regarding how the County is to conduct real estate assessments, in addition to the other statistical evidence presented by Millcreek, such as the evidence relating to CODs in other counties of this Commonwealth, constitute a sufficient basis in the record to support the trial court's conclusion that the inequities, disparities and methodology of tax assessments in Erie County are

such that a countywide reassessment is constitutionally required.[15]

■ The County failed to present any credible evidence to rebut the evidence presented by Millcreek on this issue. As the trial court noted in its April 1, 1997 order denying the County's motion for post trial relief, "the defendant was unable to offer any credible evidence, albeit [it] tried, to rebut the plaintiff's contention that the lapse of time, when considered with dramatic changes in [the] real estate market, real estate development and real estate values, as well as plaintiff's testimony that lack of directions for grading, along with inadequate guidelines, calls for reassessment." (Trial Court's Order, 4/1/97, at 1–2; Supplemental Reproduced Record (S.R.R.) at 54b.) It is also evident from the trial court's conclusions of law and findings of fact that the trial court gave significant weight to the testimony of Mr. Hayes in rendering its decision. It is, of course, well within the trial court's discretion to make such credibility determinations and, in a bench trial, to render decisions with regard to the probative value and evidentiary weight of evidence, and this Court will not disturb such determinations on appeal absent an error of law. *Walnut–Twelve Associates v. Board of Revision of Taxes of Philadelphia,* 131 Pa.Cmwlth. 404, 570 A.2d 619, *petition for allowance of appeal denied.* 525 Pa. 652, 581 A.2d 577 (1990).

In light of the overwhelming evidence supporting Millcreek's position and the trial court's findings of fact and conclusions of

---

**14.** These COD levels also exceed the CODs of Lancaster County in the *City of Lancaster* case, in which we held that such COD levels evidenced constitutional inequities in that County's tax assessments.

**15.** We further note that the record in this case also indicates that the grading procedures employed by the County's assessors were deficient in that mobile homes are assessed on a square footage basis, irrespective of the condition, year and quality of construction of the mobile home. Also, evidence adduced at trial indicated that the County engaged in a pattern of "spot reassessment" whereby certain properties were reassessed absent any "triggering event" warranting such reassessment contrary to Section 6.1 of the Second Class A and Third County Assessment law. This section provides as follows:

The subordinate assessors may change the assessed valuation on real property when a

parcel of land is divided and conveyed away in smaller parcels or when improvements are made to real property or existing improvements are removed or are destroyed. The painting of a building or the normal regular repairs to a building aggregating one thousand dollars ($1,000) or less in value annually shall not be deemed cause for a change in valuation. 72 P.S. § 5347.1. "Spot reassessment," or selective reassessment, is the "reassessment of a property or properties that are not conducted as part of a countywide revised reassessment plan and which creates, sustains or increases disproportionality among the properties' assessed value." 72 P.S. § 5342.1. As we held in *City of Lancaster,* such "spot reassessment" also constitutes grounds for a comprehensive countywide reassessment. *See also* 72 P.S. § 5020–402.

law,[16] we cannot say that reversible error has been committed in this case when the trial court ordered countywide reassessment.[17]

## IV. CONCLUSION

Thus, for the foregoing reasons, we affirm the order of the trial court which granted Millcreek's request for mandamus and ordered Erie County to conduct a countywide reassessment by October 1, 2000.[18]

## ORDER

NOW, May 28, 1998, the order of the Court of Common Pleas of Erie County in the above-captioned matter is hereby affirmed.

**16.** In its brief, the County asserts as a separate argument that Millcreek failed to introduce sufficient *statistical* evidence which demonstrated that the assessments of real property in Erie County lacked uniformity. However, as noted in the text of the opinion, the statistical information regarding the overall COD levels for the past several years was stipulated and agreed to between the parties, and the COD levels among the several classes of property are supported by the record. We also note that the record supports the statistical data cited in Millcreek's brief which delineates the non-uniformity of assessments among the different municipalities in Erie County. Furthermore, there is no specific requisite level of **statistical** information for cases of this type and we note the many other factors which necessitate a countywide reassessment throughout this opinion.

**17.** In addition to holding that the present tax assessment scheme in Erie County violates Article VIII, Section 1 of the Pennsylvania Constitution, we also hold that it violates the Equal Protection Clause of the United States Constitution in that the tax assessments of similarly situated persons are so inequitable, disparate, and, in some cases, indiscriminate, that there exists a constitutional violation in this regard as well.

**18.** Of course, this opinion should not be construed as an admonition or criticism of Erie County or its Board of Assessment Appeals, as we are mindful of the political and financial ramifications of conducting a countywide reassessment. On the other hand, we cannot countenance the constitutional violations that are taking place as a result of an outdated and non-uniform system of tax assessments.